

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-27-2007

# Lighthouse Inst v. Long Branch

Precedential or Non-Precedential: Precedential

Docket No. 06-1319

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Lighthouse Inst v. Long Branch" (2007). *2007 Decisions.* Paper 153.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/153

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1319
_____

THE LIGHTHOUSE INSTITUTE FOR
EVANGELISM, INC.,
doing business as THE LIGHTHOUSE MISSION;
REVEREND KEVIN BROWN,

Appellants

v.

CITY OF LONG BRANCH; BCIC FUNDING CORP;
BREEN CAPITAL SERVICES, INC.;
ABRAMS GRATTA & FALVO, P.C.;
PETER S. FALVO, ESQ.; JOHN DOES A-Z;
EUGENE M. LAVERGNE, ESQ.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 00-cv-03366)
District Judge: Hon. William H. Walls

_____

Argued on March 27, 2007


Before:  FISHER, JORDAN and ROTH, <u>Circuit Judges</u>

(Opinion Filed November 27, 2007)

Derek L. Gaubatz, Esquire (ARGUED)
Anthony R. Picarello, Jr., Esquire
Lori Halstead, Esquire
The Becket Fund for Religious Liberty
1350 Connecticut Avenue, N.W.
Suite 605
Washington, D.C.    20036


Michael S. Kasanoff, Esquire
Suite 321
157 Broad Street
P. O. Box 8175
Red Bank, NJ   07701

        Counsel for Appellants

Audrey J. Copeland, Esquire (ARGUED)
Marshall, Dennehey, Warner, Coleman & Goggin
620 Freedom Business Center
Suit 300
King of Prussia, PA 19406

Howard B. Mankoff, Esquire
Marshall, Dennehey, Warner,
Coleman & Goggin
425 Eagle Rock Avenue
Suite 302
Roseland, NJ   07068

              Counsel for Appellees


Wan J. Kim, Esquire (ARGUED)
Assistant Attorney General
Civil Rights Division
950 Pennsylvania Avenue
Washington, D.C.   20530

Jessica Dunsay Silver, Esquire
Nathaniel S. Pollock, Esquire
United States Department of Justice
Civil Rights Division, Appellant Section
P. O. Box 14403
Ben Franklin Station
Washington, D.C.   20044-4403

              Counsel for Amicus-Appellant USA

Paul J. Zidlicky, Esquire
David S. Petron, Esquire
Jason C. R. Oraker, Esquire
Jeffrey I. Shulman, Esquire
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.   20005

      Counsel for Amicus-Appellants Association of
      Christian Schools and International and General
      Conference of Seventh-Day Adventists

---

## O P I N I O N

---

**ROTH,** <u>Circuit Judge</u>**:**

This appeal requires us to clarify the nature of the constitutional and statutory protections enjoyed by religious assemblies against governmental interference in the form of land-use regulations. The plaintiff/appellants are the Lighthouse Institute for Evangelism, which describes itself as "a Christian church that seeks to minister to the poor and disadvantaged in downtown Long Branch, New Jersey," and its pastor, the

4

Reverend Kevin Brown.[1]  The City of Long Branch is the defendant.

The case reaches us on appeal from the grant of summary judgment to Long Branch  on Lighthouse's facial challenge to two Long Branch zoning ordinances which prevented Lighthouse from locating in a certain area of downtown Long Branch.  Lighthouse challenged the ordinances under the Free Exercise Clause of the First Amendment and the Equal Terms provision of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc(b)(1).[2]

The primary question on this appeal is whether a municipality may exclude religious assemblies or institutions from a particular zone, where some secular assemblies or institutions are allowed, without violating the Free Exercise Clause of the First Amendment or RLUIPA's Equal Terms Provision.

For the reasons explained below, we will affirm in part and vacate in part the District Court's decision on the cross-

---

[1]References to "Lighthouse" in this opinion are to both plaintiffs unless otherwise specified.

[2]RLUIPA's Equal Terms provision reads: "EQUAL TERMS – No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(1).

motions for summary judgment and we will remand this case to the District Court for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

### A. The Initial Dispute

Lighthouse began renting space at 159 Broadway in downtown Long Branch in 1992. At the end of 1994, Lighthouse purchased nearby property at 162 Broadway (the Property). The Property was then located within the C-1 Central Commercial District, which was subject to City of Long Branch Ordinance 20-6.13 (the Ordinance). The Ordinance enumerated a number of permitted uses, including among others: restaurant; variety store and other retail store; educational service and college; "Assembly hall, bowling alley, and motion picture theater;" governmental service; municipal building; and new automobile and boat showrooms. A church was not listed as a permitted use.

Between 1995 and 2000, Lighthouse attempted to obtain permission from Long Branch to employ the Property for a number of uses, including as a soup kitchen, a job skills training program, and a residence for Rev. Brown, but the use was denied in each case because the application was incomplete or

6

because the requested use was not permitted.[3]  Lighthouse was allowed, however, to use the Property as an office.

On April 26, 2000, Lighthouse submitted an application for a zoning permit to use the Property as a church.  Long Branch denied the application because the "proposed use [was] not a permitted use in the Zone" and "would require prior approvals from the Zoning Board of Adjustment."  Lighthouse did not seek a variance or appeal the decision.

## B.  First Round of Litigation

On June 8, 2000, Lighthouse filed suit in state court against Long Branch and other defendants, alleging a variety of constitutional and other violations.  Long Branch removed the case to federal court.  In September 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA).  Lighthouse promptly amended its complaint to add claims under sections 2(a) and 2(b) of RLUIPA (42 U.S.C. §§ 2000cc(a) and (b)(1) – the "Substantial Burdens" and "Equal Terms" sections), claiming that the Ordinance violated RLUIPA both on its face and as applied.[4]  Lighthouse requested

---

[3]Rev. Brown continued to live on the premises without permission for a time.

[4]Lighthouse did not appeal the District Court's grant of summary judgment to Long Branch on its claims under the Substantial Burdens section; therefore, those claims are not before us.

injunctive relief as well as damages of eleven million dollars for Lighthouse and $7,777,777 for Rev. Brown.

The District Court dismissed as either unexhausted or unripe all the claims attacking the Ordinance as applied and denied Lighthouse's motion for a preliminary injunction. Lighthouse appealed the denial of the preliminary injunction. We affirmed in a nonprecedential opinion. *Lighthouse Inst. for Evangelism Inc. v. Long Branch*, 100 Fed. Appx. 70 (3d Cir. 2004) ("*Lighthouse I*"). We reasoned that the record did not show that the Ordinance on its face barred the use of the property as a church; in particular, it was not clear to us that Lighthouse would not gain approval of its intended use by applying as an "assembly hall." *Id.* at 74-75. We noted also that Lighthouse had not proferred evidence that the Ordinance was not a neutral law of general applicability. Thus, under the rule of *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990), it could not be defeated by a Free Exercise claim alone. For that reason, we concluded that Lighthouse did not have a reasonable probability of success on the merits of its claim that the Ordinance on its face violated the Free Exercise clause. *Lighthouse I*, 100 Fed. Appx. at 75-76. As to the RLUIPA "equal terms" claim, we noted again that it was not clear that the use of the Property as a church would not be approved under the "assembly hall" language. We also concluded that Lighthouse had "failed to provide evidence to support its contention that the secular assemblies it identified were actually similarly situated such that a meaningful

8

comparison could be made under this provision." *Id.* at 77.

## C. The Redevelopment Plan

While the litigation on the Ordinance made its way through the courts, the applicable zoning ordinance was changed. On October 22, 2002, Long Branch adopted a Redevelopment Plan under N.J.S.A. 40A:12A-7 that strictly limited the use of properties within the "Broadway Corridor" area.[5] The Property was located in this area. The Broadway

---

[5]N.J.S.A. 40A:12A-7 regulates the adoption and implementation of a redevelopment plan and requires that such a plan may not be adopted without "a finding that the specifically delineated project area is located in an area in need of redevelopment or in an area in need of rehabilitation, or in both." N.J.S.A. 40A:12A-7(a). It also provides that

The redevelopment plan shall include an outline for the planning, development, redevelopment, or rehabilitation of the project area sufficient to indicate:

(1) Its relationship to definite local objectives as to appropriate land uses, density of population, and improved traffic and public transportation, public utilities, recreational and community facilities and other public improvements.

(2) Proposed land uses and building requirements in the project area.

Redevelopment Plan (the Plan) superseded the Ordinance as the land use regulation applicable to the Property.

Long Branch adopted the Plan "in order to achieve redevelopment of an underdeveloped and underutilized segment of the City." The goals of the redevelopment included "[s]trengthen[ing] retail trade and City revenues," "[i]ncreas[ing] employment opportunities," and "[a]ttract[ing] more retail and service enterprises." The Property is located in the "Broadway Corridor" of the redevelopment area, a "Regional Entertainment / Commercial" sector where the City aimed to encourage a "vibrant" and "vital" downtown residential community centered on a core "sustainable retail 'main' street." Primary uses in that sector included theaters, cinemas, culinary schools, dance studios, music instruction, theater workshops, fashion design schools, and art studios and workshops. Restaurants, bars and clubs, and specialty retail (including book and craft stores), among others, were allowed as secondary uses. Churches were not listed as a permitted use, nor were schools or government buildings; the Design Guidelines under the Plan provided that "[a]ny uses not specifically listed" were prohibited.

The Plan also created new application requirements for development within the relevant area. The first step in the process, the RFQ (Request for Qualifications), required applicants to describe the development team members' expertise and qualifications. The second step, the RFP (Request for

_____

*Id.*

10

Proposal), required a detailed description of the project. No property could be developed in the Redevelopment Area until the plans had been approved by the City Council. The Plan provided that the approved developers would acquire the necessary properties from their owners, but reserved the right for Long Branch to condemn properties if negotiations failed.

The Plan did not include an individual waiver procedure, but the Plan could be amended by ordinance of the City Council after review of the proposed amendment by the Planning Board.

On November 11, 2003, Lighthouse, as the "Long Branch Center of Faith," submitted an RFQ seeking to be designated as developer for the Property. The application, about one page long, also requested a "waiver of prohibition of church use." It specified that Rev. Brown sought "to use the property as a church and for church related functions, including assembly for prayer, pastoral residence, church offices, and a religious gift shop from the storefront portion in front of the property." The RFQ was not approved.

Lighthouse appealed to the Long Branch City Council. The City Council held an evidentiary hearing, at which Rev. Brown and two Long Branch planners presented testimony. The City Council denied the appeal, first, because the proposed use was "not permitted in the zone," and, second, because the application was insufficient since it contained no information as to finances, scope of the project, size of the congregation, aesthetics or design. The City Council also denied the request for amendment of the Plan because the "inclusion of a storefront church would jeopardize" the development of the Broadway

11

area, which was envisioned as "an entertainment / commercial zone with businesses that are for profit."[6] The City Council found that a church would "destroy the ability of the block to be used as a high end entertainment and recreation area" due to a New Jersey statute which prohibits the issuance of liquor licenses within two hundred feet of a house of worship.[7]

### D. Subsequent Litigation

After we remanded *Lighthouse I* (affirming the denial of preliminary injunction), Lighthouse filed an amended complaint, claiming that the Plan violated the Free Exercise Clause and RLUIPA. *Lighthouse Inst. for Evangelism v. Long Branch*, 406 F. Supp. 2d 507 (D.N.J. 2005) (*Lighthouse II*). The parties filed cross-motions for summary judgment. The District Court granted Long Branch's motion for summary judgment on all

---

[6]Although Lighthouse's request was for a "waiver," the City Council appears to have considered it to be a request for an amendment of the Plan since the Plan did not provide for waivers.

[7]The City Council also mentioned the existence of a Long Branch ordinance prohibiting the issuance of liquor licenses within 1,000 feet of a house of worship. Since this ordinance is not in the record and there is significant disagreement as to what exactly it proscribes and whether it even applies within the relevant area of Long Branch, we will not include it in our considerations.

claims and denied Lighthouse's cross-motion for partial summary judgment. *Id.* at 510.[8]

The District Court held that neither the Ordinance nor the Plan violated RLUIPA's Equal Terms provision, 42 U.S.C. § 2000cc(b)(1). The court concluded that in order to prevail on a claim based on this provision, a religious assembly or institution must show that it is being treated worse than a *similarly situated* secular assembly or institution; in this case, Lighthouse had not shown this (1) because, as a church, it had a different effect on the availability of liquor licenses than did secular assemblies and (2) because there was no secular comparator planning a similar combination of uses (church assembly, residence, store, Bible school, etc.). The court then determined that, even if Lighthouse were similarly situated to a secular assembly that was treated better by Long Branch's land use laws, the Ordinance and the Plan survived strict scrutiny, as Long Branch had a compelling interest in promoting the economic development of the downtown; a church, with the attendant alcohol restrictions, would thwart that goal. The court further concluded that the

---

[8]Lighthouse had moved for summary judgment on the following claims: (1) facial invalidity of the Ordinance under the Free Exercise Clause (Count III); (2) denial of equal protection of the laws to Lighthouse through Long Branch's zoning laws (Count V); (3) violations of the New Jersey Constitution (Count VIII); (4) Violation of RLUIPA, 42 U.S.C. § 2000cc(a)(1) and (b) by the Ordinance (Count XIII); (5) Violation of RLUIPA, 42 U.S.C. § 2000cc(a)(1) and (b) by the Plan (Count XIV).

"substantial burden" requirement of section 2(a)(1) of RLUIPA also applied to the section 2(b)(1) Equal Terms provision and that Lighthouse could not demonstrate that Long Branch's actions imposed a substantial burden on Lighthouse's exercise of religion. *Lighthouse II*, 406 F. Supp. 2d at 516-19.

As for the Free Exercise Clause, the District Court held that neither the Ordinance nor the Plan violated it because both were neutral laws of general applicability. *Id.* at 519-20.

Lighthouse appealed the entry of summary judgment for Long Branch and the denial of its motion for partial summary judgment with respect only to its Free Exercise and RLUIPA Equal Terms claims.[9]

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1367, and 1441, and 42 U.S.C. §§ 1983, 3612, and 2000cc-2. We have jurisdiction of the appeal under 28 U.S.C. § 1291.

We review a district court's grant of summary judgment *de novo. Gottshall v. Consol. Rail Corp.*, 56 F.3d 530, 533 (3d Cir.1995). Summary judgment is only appropriate if there are no genuine issues of material fact and the movant is entitled to

---

[9]Generally, the denial of summary judgment is not a final order subject to appeal; however, it becomes so when accompanied by an order granting a cross-motion for summary judgment. *McFarland v. Miller*, 14 F.3d 912, 917 (3d Cir. 1994).

14

judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the nonmoving party. *Id.* at 533.

## II. Discussion

### A. Mootness

As a threshold matter, Long Branch argues that Lighthouse's claims based on the Ordinance are moot because, even if the Ordinance violated RLUIPA or the Free Exercise clause, the Ordinance has now been superseded by the Plan. We have held that where a regulation is challenged as invalid on its face, "if an amendment removes those features . . . being challenged by the claim, any claim for injunctive relief becomes moot as to those features." *Nextel West Corp. v. Unity Twp.*, 282 F.3d 257, 262 (3d Cir. 2002).[10] Since the Plan superseded the Ordinance in all relevant respects, its enactment has mooted Lighthouse's claims for injunctive relief based on the facial invalidity of the Ordinance. Lighthouse's claims for compensatory damages and attorney fees, however, are not moot. *See Donovan v. Punxsutawney Area School Bd.*, 336 F.3d 211, 218 (3d Cir. 2003) (holding that although plaintiff's claim

---

[10]*Nextel* also held that if the amendment does not significantly alter the existing legislation, but leaves its objectionable features undisturbed, the claim is not moot. *Id*. As explained below, we hold here that the Plan does not contain the same objectionable features as the Ordinance.

for declaratory and injunctive relief was moot, her "damages and attorney fees claims continue[d] to present a live controversy."). We thus will allow Lighthouse's claims under the Ordinance only insofar as they are claims for compensatory damages and attorney fees.

### B. RLUIPA

Before we discuss Lighthouse's constitutional claim, we will consider its statutory claim under the Equal Terms Provision, 42 U.S.C. § 2000cc(b)(1). *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

RLUIPA is "the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burden, consistent with [Supreme Court] precedent." *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). The path to the enactment of RLUIPA is well documented. Congress initially enacted the Religious Freedom Restoration Act (RFRA) in 1993 to counter the Supreme Court's decision in *Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872 (1990), which held that neutral and generally applicable laws are not susceptible to attack under the Free Exercise Clause of the Constitution even if they incidentally burden the exercise of religion. RFRA provided that any legislation imposing a substantial burden on religion would be invalid unless it was the least restrictive means of furthering a compelling state interest. 42 U.S.C. § 2000bb *et seq.* Shortly thereafter, the Supreme

16

Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997), struck down RFRA as it applied to the States because it exceeded Congress's remedial power under Section 5 of the Fourteenth Amendment.

In reaction, Congress enacted RLUIPA. More limited in reach than RFRA, RLUIPA addresses only land use regulations, Section 2 – 42 U.S.C. § 2000cc, and the religious rights of institutionalized persons, Section 3 – 42 U.S.C. § 2000cc-1. The land-use section of the statute is further subdivided into two sections: Substantial Burdens,§ 2000cc(a), and Discrimination and Exclusion, § 2000cc(b). These sections provide:

(a) SUBSTANTIAL BURDENS –

(1) GENERAL RULE – No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution –

(A) is in furtherance of a compelling governmental interest; and

17

(B) is the least restrictive means of furthering that compelling governmental interest.

(2) SCOPE OF APPLICATION – This subsection applies in any case in which -

(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance . . .

(B) the substantial burden affects . . . commerce . . . among the several States . . .

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government

18

makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

(b) DISCRIMINATION AND EXCLUSION –

(1) EQUAL TERMS – No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) NONDISCRIMINATION – No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

(3) EXCLUSIONS AND LIMITS – No government shall impose or

19

implement a land use regulation that –

> (A) totally excludes religious assemblies from a jurisdiction; or

> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

Lighthouse argues the District Court should have entered summary judgment in its favor because both the Ordinance and the Plan violate RLUIPA's Equal Terms provision on their face by allowing secular assemblies, but not religious ones, to locate in the zones they regulate. Lighthouse contends the District Court misinterpreted RLUIPA, imposing additional requirements not contemplated by the statute. It urges us to reverse the judgment of the District Court and to hold that (1) a plaintiff, advancing a claim under the Equal Terms provision, need not prove that the unequal treatment imposed a "substantial burden" on its exercise of religion; (2) the Equal Terms provision does not require the identification of a similarly situated comparator; a religious assembly need only show that the challenged land-use regulations treat *any* secular assembly better than the religious plaintiff; and (3) unlike the Substantial Burdens section, the Equal Terms provision does not provide for strict scrutiny of offending land-use regulations but rather operates under a strict liability standard, making the regulations

20

automatically invalid.  Long Branch responds that the District Court's decision was correct.

The parties substantially agree that both the Ordinance and the Plan are land use regulations within the meaning of 42 U.S.C. 2000cc(b), that Lighthouse's proposed church use is use as a religious assembly, and that several of the permitted uses under both ordinances are nonreligious assemblies.  The question is what else Lighthouse must show in order to prevail.

      1.  **Must a plaintiff in an action under RLUIPA's Equal Terms provision show that the alleged discriminatory land-use regulation imposes a "substantial burden" on its religious exercise?**

The District Court held that a plaintiff raising a claim under the Equal Terms provision must show that the challenged land-use regulation imposed a "substantial burden" on its exercise of religion.  We disagree because the structure of the statute and the legislative history clearly reveal that the substantial burden requirement does not apply to claims under 2(b)(1), the Equal Terms provision.

Section 2(b)(1) does not include "substantial burden" as an element; section 2(a)(1), the Substantial Burdens section, titled as such, does.  Since Congress evidently knew how to require a showing of a substantial burden, it must have intended not to do so in the Equal Terms provision.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("where Congress

21

includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

The legislative history supports the conclusion that the Equal Terms provision does not incorporate a substantial burden requirement. In presenting the bill for consideration, co-sponsor Senator Hatch stated RLUIPA would "ensure that if a government action substantially burdens the exercise of religion . . ., the government must demonstrate that imposing the burden serves a compelling public interest and does so by the least restrictive means. *In addition*, with respect to land use regulation, the bill specifically prohibits various forms of religious discrimination and exclusion." 146 Cong. Rec. S7774 (emphasis added). Neither the House nor the Senate sponsors' analyses mention the phrase "substantial burden" in connection with the Discrimination and Exclusion section or its Equal Terms subpart. *See* 146 Cong. Rec. E1563 and 146 Cong. Rec. S7774.

The statements by the bill's sponsors, quoted by the District Court in support of its construction of the Equal Terms provision, are not persuasive evidence of contrary legislative intent. *See Lighthouse II*, 406 F. Supp. at 519 (quoting 146 Cong. Rec. S7774-7776) (joint statement of Sen. Hatch and Sen. Kennedy). First, the court quoted the Senate sponsors' statement that the Equal Terms provision "enforce[s] the Free Exercise Clause against laws that burden religion and are not neutral and generally applicable." The use of the word "burden" in this context, however, is descriptive of the area at which the

22

statute is targeted; it does not create a "substantial burden" element in the provisions of 2 (b)(1). Moreover, cases interpreting the First Amendment's Free Exercise clause do not require a plaintiff, challenging a discriminatory regulation, to show that it imposes a substantial burden on plaintiff's religious exercise. *See Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) ("Under *Smith* and *Lukumi* . . . there is no substantial burden requirement when government discriminates against religious conduct"). It follows then that there is no requirement that a statute, like the Equal Terms provision of RLUIPA, which enforces the Free Exercise clause, include such a burden as a required element of proof.

Second, the District Court relied on the statement in the legislative history that "the party asserting a violation of this Act shall in all cases bear the burden of proof that the governmental action in question constitutes a substantial burden on religious exercise." This is a commentary on RLUIPA's burden-shifting provision, which directs that "[i]f a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion of any element of the claim" except that the plaintiff retains the burden of proof on substantial burden. 42 U.S.C. § 2000cc-2(b). This provision and the Senate sponsors' statement on it merely establish that, where substantial burden is an element of the claim, the plaintiff must prove it; they do not address when substantial burden is such an element.

23

Finally, the District Court cites the proposition that the Discrimination and Exclusion section "directly address[es] some of the more egregious forms of land use regulation, and provides more precise standards than the substantial burden and compelling interest tests." This statement differentiates *between* the substantial burden test and the "more precise standards" of section 2(b). Thus, it detracts from, rather than lending support to, the District Court's construction.

The two Courts of Appeals that have interpreted RLUIPA's Equal Terms provision have agreed that a plaintiff need not show substantial burden to prevail under it. *See Konikov v. Orange County*, 410 F.3d 1317, 1327-29 (11th Cir. 2005) (holding that although the zoning code at issue did not impose a substantial burden on plaintiff's religious exercise, it violated RLUIPA's equal terms provision because it was enforced in a way that treated religious organizations on less than equal terms with secular ones); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1229-35 (11th Cir. 2004) (a zoning ordinance prohibiting churches in a certain district violated RLUIPA's equal terms provision although it did not impose a substantial burden on plaintiffs); *Digrugilliers v. Consolidated City of Indianapolis*, No. 07-1358, 2007 WL 3151201 at *2 (7 th Cir. 2003); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003) ("the substantial burden and nondiscrimination provisions are operatively independent of one another"). We now hold as well that a plaintiff challenging a land-use regulation under section 2(b)(1) of RLUIPA does not need to present evidence that the regulation imposes a substantial burden on its religious exercise.

24

### 2. Does a RLUIPA Equal Terms plaintiff need to show that it is "similarly situated" to a secular comparator that was treated better?

The District Court held that Lighthouse could not prevail on its RLUIPA Equal Terms claim because it could not identify a similarly situated nonreligious comparator. Lighthouse contends this was error and urges us to take the position that a plaintiff, asserting a violation of the Equal Terms provision, needs to show nothing more than that the challenged land-use regulation treats one or more nonreligious assemblies or institutions better than a religious assembly or institution, without regard for the objectives of the regulation or the characteristics of the secular and religious comparators. We conclude that the District Court was correct in construing RLUIPA's Equal Terms provision to require a plaintiff to do something more than identify *any* nonreligious assembly or institution that enjoys better terms under the land-use regulation. Nevertheless, we find that the court erred in requiring the religious plaintiff to point to a secular comparator that proposes the same combination of uses. As we will explain, what the Equal Terms provision does in fact require is a secular comparator that is similarly situated as to the regulatory purpose of the regulation in question – similar to First Amendment Free Exercise jurisprudence.

It is undisputed that, when drafting the Equal Terms provision, Congress intended to codify the existing jurisprudence interpreting the Free Exercise Clause. *See* 146 Cong. Rec. S7774 (July 27, 2007) (Senate Sponsors' statement)

25

(sections 2(b)(1) and (b)(2) "enforce the Free Exercise rule against laws that burden religion and are not neutral and generally applicable"). Under Free Exercise cases, the decision whether a regulation violates a plaintiff's constitutional rights hinges on a comparison of how it treats entities or behavior that have the same *effect* on its objectives.

As the Supreme Court held in *Smith,* regulations that are neutral and of general applicability are presumptively valid under the Free Exercise clause even if they impose an incidental burden on the exercise of religion. *Smith*, 494 U.S. at 878-79. A regulation does not automatically cease being neutral and generally applicable, however, simply because it allows certain secular behaviors but not certain religious behaviors. The impact of the allowed and forbidden behaviors must be examined in light of the purpose of the regulation. In addition, when a government permits secular exemptions to an otherwise generally applicable government regulation, the Free Exercise Clause requires that the government accord equal treatment to religion-based claims for exemptions that would have a similar impact on the protected interests.

The Supreme Court's opinion in *Lukumi* makes this point clear. That case involved a challenge by practitioners of the Santeria religion to a series of city ordinances prohibiting the animal sacrifices that are part of Santeria rituals. The Supreme Court held that the ordinances, taken together, were neither neutral nor generally applicable, but rather had been "gerrymandered" to prohibit almost exclusively the religious sacrifice of animals; none of the city's aims in enacting the ordinances (preventing cruelty to animals and limiting the health

26

risks caused by improper disposal of animal carcasses and consumption of uninspected meat) could warrant prohibiting the killing of animals in religious rituals while allowing, among other secular activities, hunting, fishing and the use of rabbits to train greyhounds. *Lukumi*, 508 U.S. at 536-7. Focusing specifically on a zoning ordinance that prohibited the slaughter of animals outside the areas zoned for slaughterhouses, the Court pointed out that it made an exception for "any person, group, or organization that slaughters or processes for sale, small numbers of hogs and/or cattle per week " and remarked that the city had "not explained why commercial operations that slaughter small numbers of hogs and cattle do not implicate its professed desire to prevent cruelty to animals and preserve the public health." *Id.* at 545 (internal quotation marks omitted). Thus, the reason the ordinance was suspect was not merely because it allowed secular versions of the religious behavior it prohibited, but because both behaviors impacted the city's declared goals in the same way. The unequal treatment of equally detrimental behaviors is what caused the violation of the Free Exercise clause.

This Court's Free Exercise opinions in *Fraternal Order of Police v. City of Newark,* 170 F.3d 359 (3d Cir. 1999)*, Tenafly,* 309 F.3d 144*,* and *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004), confirm that we have consistently understood Free Exercise analysis to include an examination of the comparators' relation to the aims of the regulation. First, in *Fraternal Order of Police*, we examined a challenge by Muslim police officers against the Newark Police Department's requirement that they shave beards that they wore for religious reasons. The declared aim of the Department's no-beard policy

27

was to impose a uniform look on its police force.  *Id.* at 366.
The policy exempted two classes of individuals:  undercover
officers and uniformed officers who wore beards for medical
reasons.   We held that the medical exemption made the
regulation subject to heightened scrutiny under the Free Exercise
Clause because it "indicate[d] that the Department ha[d] made
a value judgment that secular (i.e., medical) motivations for
wearing a beard are important enough to overcome its general
interest in uniformity but that religious motivations are not." *Id.*
Importantly, however, we also made it clear that the policy's
other categorical exemption, for undercover officers, did not
raise Free Exercise concerns.  The Department clearly had no
interest in making its *undercover* officers easily identifiable as
police, and thus that exception did not "undermine the
Department's interest in uniformity."  *Id.*

Similarly, we held in *Tenafly* that the township's
selective enforcement of its prohibition against affixing signs to
utility poles suggested "a discriminatory intent" because the
township routinely allowed, among other things, house number
signs, orange ribbons supporting one position in a controversy
over school regionalization, and directional signs bearing
crosses to show the location of churches, but it denied
permission to an Orthodox Jewish group to affix lechis,
religiously significant items, to the poles. *Tenafly*,  309 F.3d at
165-167.  Again, however, we were careful to note that not *all*
exceptions to the facially neutral rule were troublesome, only the
ones that bore the same relation to the purposes of the
regulation, *i.e.*, preventing clutter, as did the prohibited lechis.
Thus, the Borough of Tenafly's exception for cable and
telephone wires did not make the regulation any less neutral or

28

generally applicable because "utility poles exist to facilitate telecommunications" and therefore "utility wires are obviously unlike any of the other materials [Tenafly had] allowed people to affix to the poles." *Id.* at 168 n.29.

The same principle held true in *Blackhawk.* There, we examined the Commonwealth of Pennsylvania's refusal to waive a wildlife permit fee for a Native American who kept two bears for religious reasons although the statute contained categorical waivers for zoos and "nationally recognized circuses." *Blackhawk*, 381 F.3d. at 211. In holding that the statute violated the Free Exercise clause, we focused on the fact that categorical waivers for circuses and zoos – exemptions intended to "serve the Commonwealth's interest in promoting commerce, recreation, and education" and which "undermine the interests served by the fee provision to at least the same degree as would a [religious] exemption" – were available, but the Commonwealth refused to extend an individual religious waiver, which would have served "these or analogous interests." *Id.*

We see that the Free Exercise jurisprudence of the Supreme Court and of this Court teaches that the relevant comparison for purposes of a Free Exercise challenge to a regulation is between its treatment of certain religious conduct and the analogous secular conduct that *has a similar impact on the regulation's aims*. In each case, a regulation's preferential treatment of secular behavior that did not affect the regulation's purpose in the same way as the prohibited religious behavior did not raise Free Exercise concerns. Heightened scrutiny was warranted only when a principled distinction could not be made

29

between the prohibited religious behavior and its secular comparator in terms of their effects on the regulatory objectives.

Thus, the District Court was correct in holding that the relevant analysis under the Equal Terms provision of RLUIPA must take into account the challenged regulation's objectives: a regulation will violate the Equal Terms provision only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated *as to the regulatory purpose*. There is no need, however, for the religious institution to show that there exists a secular comparator that performs the same functions. For that reason, the District Court erred in focusing on Lighthouse's inability to identify a secular comparator with a similar range of uses.[11]

---

[11]Because we construe the statute to conform to the contours of Free Exercise jurisprudence with respect to this aspect, we need not reach the question whether Congress would have exceeded its powers under Section 5 of the Fourteenth Amendment, under which the Equal Terms provision is enacted, by mandating maximum-possible favorable treatment for religious institutions without regard for legitimate governmental objectives. *See City of Boerne*, 521 U.S. at 519 (Congress may use its power under Section 5 to enforce the rights guaranteed by the First Amendment, but may use its power only to "enforce" a constitutional right, not to substantively alter it. "Legislation which alters the remedy of the Free Exercise Clause cannot be said to be enforcing the Clause.")

Because we limit the statute in this way, we are not

30

To support its position that a RLUIPA Equal Terms plaintiff does not need to identify a comparator, however, Lighthouse relies on the opinion of the Eleventh Circuit Court of Appeals in *Midrash Sephardi,* 366 F.3d 1214, and the recent Seventh Circuit Court of Appeals decision following it, *Vision Church, United Methodist v. Village of Long Grove*, 468 F.3d 975 (7th Cir. 2006). Nevertheless, we agree with Long Branch, the District Court, and the United States (which appeared as *amicus curiae* in this case) that we should decline this invitation to adopt the Eleventh Circuit's expansive reading of the statute.

In *Midrash Sephardi*, two Orthodox Jewish synagogues challenged a zoning scheme which, like the one at issue here, prohibited churches and synagogues within the Town of Surfside's two-block business district while allowing theaters, restaurants, private clubs, and other secular uses. Surfside defended the zoning ordinance on the basis of its need to "invigorate the business district and . . . create a strong tax base through its retail district." *Id.*, 366 F.3d at 1221. The District Court concluded that the ordinance did not violate RLUIPA because the permitted secular assemblies and institutions were not similarly situated to churches and synagogues: "private clubs provid[e] more of a social setting [and] provide more

---

concerned about Congress's authority under Section 5 to impose what amounts to a strict liability standard on regulations that violate the Equal Terms provision. The dissent, however, does not limit its interpretation of section 2(b)(1) to Free Exercise jurisprudence and for that reason we doubt the viability of the dissent's interpretation. *See* footnote 14 *infra*.

31

synergy for the shopping district in keeping with the purpose of [the ordinance]." *Id.* at 1230 (quoting *Midrash Sephardi v. Surfside*, No. 99-1566-CIV, 2000 U.S. Dist. LEXIS 22629, at *32-33 (S.D. Fla. July 13, 2000) (*Midrash Sephardi I*)). In reaching this conclusion, the District Court relied on Justice Harlan's "natural perimeter" test, developed in *Walz v. Tax Comm'n*, 397 U.S. 664 (1970), under which a regulation is considered neutral and presumptively valid under the religious clauses of the First Amendment if its "circumference . . . encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter." *See Walz*, 397 U.S. at 696 (Harlan, J., concurring).

The District Court reasoned, in the case of the Surfside ordinance, that the regulation generally allowed uses that would advance its aims while prohibiting a varied group of uses, including "churches, synagogues, educational or philanthropic institutions (including museums), parking lots and garages, public and governmental buildings and public utility/public service uses." *Midrash Sephardi I*, 2000 U.S. Dist. LEXIS 2262 at *31.

The Court of Appeals for the Eleventh Circuit disagreed with the District Court's reasoning. It concluded that RLUIPA's plain language provided the statute's own definition of the "natural perimeter" for a valid land-use regulation, namely, "the category of 'assemblies or institutions.'"[12] *Id.* In other words,

---

[12] The court looked simply to the dictionary for a definition of "assembly" as "a company of persons collected together in

according to the Eleventh Circuit, all assemblies and institutions "travel" together under RLUIPA: if a zoning regulation allows a secular assembly, all religious assemblies must be permitted. *See id.* at 1230-31.[13] *See also Vision Church*, 468 F.3d 975,

---

one place and usually for some common purpose (as deliberation and legislation, worship, or social entertainment)" and "institution" as "an established society or corporation: an establishment or foundation esp[ecially] of a public character," *id.* at 1230, quoting Webster's 3d New Int'l Unabridged Dictionary 131, 1171 (1993).

[13]Having created this broad scope for "equal terms," the *Midrash Sephardi* court then incorporated the *Smith-Lukumi* line of precedent, requiring strict scrutiny to determine if the ordinance was in fact neutral and generally applicable, concluding it was not, first because both overinclusive and underinclusive with respect to its goals of spurring commercial development in the business district and second because the documents showed the motivations for the synagogues' activities played a role in the town's thinking. *Id.* at 1233-35. We prefer, however, to interpret section 2(b)(1)'s "equal terms" as directed to "similarly situated" comparators in regard to the regulatory purpose of the ordinance, see *supra*, and to reject the *Midrash-Sephardi* court's adoption of a broad scope comparator and its addition of a "strict scrutiny" element to be incorporated into RLUIPA § 2b(1), *see* Part II.B.3 *supra*. As we conclude in Part II.B.3, the incorporation of "strict scrutiny" into section 2(b)(1) is inconsistent with its express language. We surmise that the *Midrash-Sephardi* court required a strict scrutiny

1003 (holding that a plaintiff making a claim under RLUIPA section 2(b)(1) need not identify a nonreligious comparator that is "similarly situated in all relevant respects"). *But see Konikov*, 410 F.3d 1317 (limiting *Midrash Sephardi* to facial challenges and holding that a similarly situated secular comparator must be identified for as-applied challenges).

We are not persuaded by the reasoning of the Eleventh Circuit. Its reading of the statute would lead to the conclusion that Congress intended to force local governments to give any and all religious entities a free pass to locate wherever any secular institution or assembly is allowed. Thus, under the Eleventh Circuit's interpretation, if a town allows a local, ten-member book club to meet in the senior center, it must also permit a large church with a thousand members – or, to take examples from the Free Exercise caselaw, it must permit a religious assembly with rituals involving sacrificial killings of animals or the participation of wild bears – to locate in the same neighborhood regardless of the impact such a religious entity might have on the envisioned character of the area. *See Lukumi,* 508 U.S. at 520; *Blackhawk,* 381 F.3d 202. We believe this result would be contrary to the text of the statute and to the expressed intent of Congress. We conclude instead

_____

examination in order that its holding conform to existing Free Exercise case law – see footnote 11 *supra*. However, we believe that, unlike the *Midrash-Sephardi* court, we have come to a constitutionally acceptable interpretation of section 2(b)(1), following its express terms, without incorporating additional terms into it.

34

that a religious plaintiff under the Equal Terms Provision must identify a better-treated secular comparator that is similarly situated in regard to the *objectives* of the challenged regulation.

### 3. Should RLUIPA's 2 (b)(1) be read as requiring strict scrutiny?

The final issue of statutory construction before us is whether the Equal Terms provision should incorporate a required strict scrutiny analysis of a regulation that treats a religious assembly or institution on less than equal terms with similarly situated nonreligious assemblies or institutions. We hold that RLUIPA's Equal Terms provision operates on a strict liability standard; strict scrutiny does not come into play.

Our analysis of whether strict scrutiny applies to the Equal Terms provision is informed by our discussion of whether a plaintiff under this provision must show a "substantial burden," *supra*. The land-use provisions of RLUIPA are structured to create a clear divide between claims under section 2(a) (the Substantial Burdens section) and section 2(b) (the Discrimination and Exclusion section, of which the Equal Terms provision is a part). Since the Substantial Burden section includes a strict scrutiny provision and the Discrimination and Exclusion section does not, we conclude this "disparate exclusion" was part of the intent of Congress and not an oversight. *See Russello*, 464 U.S. at 23.

In reaching this conclusion, we again must part ways with the Eleventh Circuit, which has held that "a violation of the Equal Terms provision is not necessarily fatal to the land use

35

regulation" but must "'undergo strict scrutiny.'" *Primera Iglesia Bautista Hispana de Boca Raton*, 450 F.3d 1295, 1308 (11th Cir. 2006) (quoting *Midrash Sephardi*, 366 F.3d at 1232). The Eleventh Circuit grounded this conclusion on the observation that, according to legislative history, "RLUIPA's equal terms provision codifies the *Smith-Lukumi* line of [Free Exercise] precedent," which imposes strict scrutiny "where a law fails to similarly regulate secular and religious conduct implicating the same government interests." *Midrash Sephardi*, 366 F.3d at 1232. As discussed at length above, we give deference to Congress's intent to codify the Free Exercise jurisprudence. In that regard, however, we find that Congress clearly signaled its intent that the operation of the Equal Terms provision *not* include strict scrutiny by the express language of sections 2a(1) and 2b(1) and by incorporating the element of Free Exercise case law, as can be seen in the language "equal terms," that requires a determination that there is a secular comparator as to the objectives of the challenged regulation, *see Lukumi*, 508 U.S. at 536-37. Thus we decline to follow the Eleventh Circuit's reasoning. We hold instead that, if a land-use regulation treats religious assemblies or institutions on less than equal terms with nonreligious assemblies or institutions that are no less harmful to the governmental objectives in enacting the regulation, that regulation – without more – fails under RLUIPA.[14]

---

[14]With our definition of comparator as a secular assembly that has a similar impact as a religious assembly on the regulation's aims, we are putting the teeth into section 2(b)(1) that it needs to follow Free Exercise case law. It is because the

36

**4. Did the District Court err in granting summary judgment for Long Branch on the RLUIPA Equal Terms claims?**

We have construed the RLUIPA Equal Terms section to include neither a substantial burden nor a strict scrutiny requirement. What the Equal Terms section does require is that the plaintiff show that it was treated less well than a nonreligious comparator that had an equivalent negative impact on the aims of the land-use regulation. In sum, a plaintiff asserting a claim under the RLUIPA Equal Terms provision must show (1) it is a religious assembly or institution, (2) subject to a land use regulation, which regulation (3) treats the religious

_____

*Midrash-Sephardi* court defined "comparator" so broadly – despite the "equal terms" language of section 2(b)(1) – that, in order to conform to Free Exercise jurisprudence, the court had to create a "strict scrutiny" element in section 2(b)(1).

Similarly, our concern with the dissent is that it formulates an equally boundless definition of "assembly" as did the *Midrash-Sephardi* court, but then the dissent requires no substantial burden, no strict scrutiny and no limitation on the secular comparator. This expansive reading of section 2(b)(1), in our opinion, goes beyond existing free exercise jurisprudence and as such would render section 2(b)(1) unconstitutional by creating a substantively altered right not heretofore cognizable in Free Exercise jurisprudence. *See City of Boerne*, 521 U.S. at 519.

37

assembly on less than equal terms with (4) a nonreligious assembly or institution (5) that causes no lesser harm to the interests the regulation seeks to advance. *Cf. Primera Iglesia Bautista*, 450 F.3d at 1307 (enumerating elements 1-4 as the requirements of a RLUIPA section 2(b)(1) cause of action). We must now determine under this analytical framework whether the District Court correctly decided that Long Branch was entitled to summary judgment on Lighthouse's Equal Terms claims with regard to both the Ordinance and the Plan.

### (i) The Plan

We begin, out of chronological order, with the Plan. The Plan allows non-religious assemblies such as theaters, cinemas, performance art venues, restaurants, bars and clubs, culinary schools, and dance studios, but not any non-listed uses, including churches and synagogues. Thus the question is whether the exclusion of churches and religious assemblies from the Broadway Corridor treats the churches on less than equal terms with nonreligious assemblies or institutions whose presence would cause no lesser harm to the redevelopment and revitalization of the Corridor. We conclude that it does not.

Long Branch's goal in adopting the Plan is well documented – it was to "achieve redevelopment of an underdeveloped and underutilized segment of the City." Long Branch's hope is for the "Broadway Corridor" to become a core "sustainable retail 'main' street" that will anchor a "vibrant" and "vital" downtown residential community. Long Branch argues that churches are by their nature not likely to foster the kind of extended-hours traffic and synergetic spending it wishes to

38

foster in the Broadway Corridor and that churches are different from the allowed secular assemblies because, by operation of a New Jersey statute prohibiting the issuance of liquor licenses in the vicinity of houses of worship, permitting churches into the Broadway Corridor would hinder the development of the kind of modern entertainment-oriented district that Long Branch envisages. *See* N.J.S.A. 33:1-76 (with the exception of certain "grandfathered" establishments, "no license shall be issued for the sale of alcoholic beverages within two hundred feet of any church or public schoolhouse or private schoolhouse not conducted for pecuniary profit").

We do not need to reach the question whether a church by its very nature is unlikely to contribute to the development of a "vibrant" and "vital" downtown community centered on an entertainment and retail district. We agree with Long Branch that churches are not similarly situated to the other allowed assemblies with respect to the aims of the Plan where, by operation of a state statute, churches would fetter Long Branch's ability to allow establishments with liquor licenses into the Broadway Corridor. It would be very difficult for Long Branch to create the kind of entertainment area envisaged by the Plan – one full of restaurants, bars, and clubs – if sizeable areas of the Broadway Corridor were not available for the issuance of liquor licenses.[15]

---

[15]We note that the Seventh Circuit Court of Appeals in its recent decision in *Digrugilliers*, 2007 WL 3151201 at *3, interpreting the Equal Terms provision of section 2(b)(1), held that government "cannot, by granting churches special privileges

Lighthouse, with the support of *amici* Association of Christian Schools International and the General Conference of Seventh-Day Adventists, argues that the existence of the New Jersey statute is not dispositive for three reasons. First, Lighthouse has offered to waive its rights under it in perpetuity; second, a State cannot "immunize" itself against a constitutional duty by artificially creating a distinction that it can then invoke to justify disparate treatment; and, third, Long Branch admitted that it had not actually conducted any studies to determine if churches would have a negative impact.

Long Branch responds that a waiver would be ineffective because it would have to be renewed at every license renewal or transfer. Long Branch is correct. Under N.J.S.A. 33:1-76.2, if a church annually waives its protection under the statute with respect to a license for 15 years, the holder of the license can apply for renewal "without further or renewed authority, or waiver, of the church of the school." Every new licensee, however, would require a new waiver. This could cause

_____

[Indiana law forbids the sale of liquor within 200 feet of a church] . . ., furnish the premise for excluding churches from otherwise suitable districts." We do not so easily dismiss N.J.S.A. 33:1-76, the New Jersey statute barring liquor licenses within 200 feet of a church. The statute was enacted many years ago – not to discriminate against churches, but to favor them. We point out also that the New Jersey statute bars liquor licenses within 200 feet of a non-profit "schoolhouse," an another type of assembly which is not permitted in the Redevelopment District.

confusion and might give the church unacceptable control over the development of the downtown area. In addition, even if a perpetual waiver were practically possible, in order to act neutrally toward all potential religious applicants, Long Branch could not simply grant Lighthouse an exemption. It would have to amend the regulation to allow *all* religious institutions to establish themselves within the relevant zones on the condition that they waive their rights under the law. It is not inconceivable that such a requirement would interfere with a potential applicant's religious tenets and cause Long Branch impermissibly to entangle itself in an individual religious institution's exercise of religion.[16]

---

[16]Similarly, Lighthouse argues that it is, in fact, the kind of church that would have a positive impact on the kind of downtown district Long Branch is trying to create because its Pentecostal services are "upbeat" and because it would hold several services a day, including late at night. Rev. Brown testified he would want to use the building "24 and 7," and place a storefront religious retail store there. The city planner conceded that the presence of a retail store would make the church "more compatible" with its retail neighbors. However, for Long Branch to allow Lighthouse an exemption because of the "upbeat" nature of its services and their frequency, as well as Lighthouse's willingness to engage in commercial activities, is to risk discriminating *between* religious uses in order to avoid potential discrimination *against* religious uses. *See Larson v. Valente*, 456 U.S. 228 (1982) (invalidating a state statute that regulated the solicitation of donations by charitable organizations if, but only if, the organization solicited more than

Lighthouse's second argument is equally unpersuasive. On its face, the alcohol-free-zone law was enacted to *favor* churches, not to *disfavor* them. Although its effect in this context is to handicap religious institutions, it cannot be said that the Plan and the New Jersey statute, taken together, suggest improper motives. Indeed, we have no concern about the earnestness of Long Branch's intent with the Plan. The Plan allows only the kind of assemblies that are likely to further its goal – theaters, cinemas, and performing arts centers, but not, for example, strip clubs. The allowed uses are establishments that generate relatively high income and encourage visitors to linger in the downtown area into the evening. In addition, the Plan exhibits internal consistency by not allowing schools – under the New Jersey statute non-profit "schoolhouses" would trigger the same restrictions as churches on the availability of liquor licenses. *See* N.J.S.A. 33:1-76.

Finally, we are not persuaded by Lighthouse's argument that Long Branch failed to present any evidence that the unavailability of liquor licenses would detrimentally affect its plans for a "vibrant" and "vital" downtown centered on a high-traffic, extended-hours retail and entertainment district. Although there may be room for disagreement over Long

_____

50% of its funds from nonmembers: the statute "created a denominational preference because the burdens of the regulation clearly discriminated against religious organizations that were significantly involved in fund raising activities aimed at nonmembers.") We do not believe Long Branch must run this risk.

Branch's prioritizing of the availability of alcohol consumption over the ability to seek spiritual enlightenment, it is clear that Long Branch could not create a downtown area where restaurants, clubs, bars, retail and entertainment facilities synergize if Long Branch could not issue liquor licenses throughout that area.

Thus, we agree with the District Court that Long Branch is entitled to summary judgment on Lighthouse's RLUIPA claim as regards the Plan because Lighthouse has placed no evidence in the record that the Plan treats a religious assembly on less than equal terms with a secular assembly that would cause an equivalent negative impact on Long Branch's regulatory goals.

### (ii) The Ordinance

We reach a different result with respect to the Ordinance. Unlike the Plan, the Ordinance's aims are not well documented. The Ordinance permitted a range of different uses in the Central Commercial District, including a restaurant, variety store and other retail store, educational service and college, "Assembly hall, bowling alley, and motion picture theater," governmental service, municipal building, new automobile and boat showroom, and "High Technology - Light Industrial." Among the uses permitted upon issuance of a conditional use permit were motor vehicle service station and public utility.

Although it appeared to us in *Lighthouse I* that the Ordinance, on its face, might allow all forms of assembly under the "Assembly Hall" category, later discovery clarified that Long Branch's construction of the term "Assembly Hall" did not

43

include use as a religious assembly. *Cf. Lighthouse I*, 100 Fed Appx. at 74-75. Because there is nothing in the record describing Long Branch's objectives for the Central Commercial District under the Ordinance and because it is not apparent from the allowed uses why a church would cause greater harm to regulatory objectives than an "assembly hall" that could be used for unspecified meetings, the District Court erred in granting summary judgment to Long Branch on this claim. Rather, Lighthouse is entitled to summary judgment in its favor because Long Branch has failed to create a genuine issue of material fact as to whether the Ordinance treated religious assemblies or institutions on less than equal terms with non-religious assemblies or institutions that caused equivalent harm to its governmental objectives. We will therefore remand this claim to the District Court to enter summary judgment for Lighthouse and to determine compensatory damages for the period between Lighthouse's application for a waiver as a church and the enactment of the Plan. The District Court may also, at its discretion, award appropriate attorney fees. *See* 42 U.S.C. § 1988(b). Since Lighthouse's claim for injunctive relief under the Ordinance is moot, however, only monetary relief is available to it.

## C. Free Exercise Clause

Because we have held that Long Branch is entitled to summary judgment on its claim based on the invalidity of the Ordinance under RLUIPA, we do not reach the question whether it is also invalid under the Free Exercise Clause. *See Lyng*, 485 U.S. at 446 (a court should not reach a constitutional issue unless a decision on the constitutional question could

entitle plaintiff to relief beyond what is available to him on his statutory claims).  However, since we have affirmed the District Court's grant of summary judgment to Long Beach on its claim that the Plan does not violate RLUIPA, we now turn to the question whether the Plan violates Lighthouse's constitutional right to free exercise of religion.  We conclude that the District Court did not err in granting summary judgment to Long Branch because (1) Lighthouse has not presented any evidence that being barred from a small area in downtown Long Branch is actually a restriction on its religious exercise, as opposed to a simple economic inconvenience; and (2) even if Lighthouse had alleged a constitutionally cognizable burden on its religious exercise, the Plan is a neutral regulation of general applicability subject only to rational basis review, which it survives.

### 1. Has Lighthouse Placed Evidence in the Record That Long Branch's Redevelopment Plan Burdens Its Free Exercise of Religion?

The First Amendment prohibits Congress from enacting any laws "respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  The Free Exercise Clause applies to states and local governments through the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

The right to free exercise of religion is "first and foremost, the right to believe and profess whatever religious doctrine one desires."  *Smith*, 494 U.S. at 877.  Because religious exercise often involves conduct, prohibiting that conduct is equivalent to prohibiting the free exercise of religion:

45

the exercise of religion often involves not only belief and profession but the performance of (or abstention from) physical acts:  assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation. It would be true, we think (though no case of ours has involved the point), that a State would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display.

*Id.* at 878.

However, unlike RLUIPA, which explicitly defines as religious exercise:  "The use, building, or conversion of real property for the purpose of religious exercise," the Free Exercise Clause does not define land use as a religious exercise.  *Cf.* 42 U.S.C. 2000cc-5(7)(B).  Indeed, several sister circuits have held that, when the plaintiff does not show that locating its premises in a particular location is important in some way to its religion and the area from which plaintiff's building is excluded is not large, there is no constitutionally cognizable burden on free exercise. *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 654 (10th Cir. 2006) (inability on the part of a church to open a day care center in a particular district did not constitute "more than an incidental burden on religious conduct"); *Messiah Baptist Church v. County of Jefferson*, 859 F.2d 820, 824-25 (10th Cir.1988) ("[a] church has no

46

constitutional right to be free from reasonable zoning regulations nor does a church have a constitutional right to build its house of worship where it pleases"; it did not matter that the zoning regulations at issue had the incidental effect of making the church's exercise of religion more expensive because it was compelled to build elsewhere in the county); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 306-07 (6th Cir.1983) (where construction of building for worship had no ritualistic significance, a zoning ordinance prohibiting its erection in a residential district did not impose a substantial burden on the exercise of religion); *but see Islamic Ctr. of Miss., Inc. v. City of Starkville*, 840 F.2d 293, 298-99 (5th Cir. 1988) (enforcement of zoning laws making the only mosque in town relatively inaccessible by believers without cars was an undue burden on religious practice). We join these courts in holding that, when a religious plaintiff makes a Free Exercise challenge to a zoning regulation, it must explain in what way the inability to locate in the specific area affects its religious exercise.[17]

---

[17] Two other courts have held similarly, but on the basis of an analysis of the magnitude of the burden rather than strictly of its nature. *See Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221, 1224 (9th Cir. 1990) (no substantial burden on a church that claimed home worship was part of the tenets of its religion, since it was undisputed that the church, prior to applying for a permit for church use in a residential area, had worshipped in the banquet room of a hotel, and where the ordinance did not prohibit worship in all homes, only in the particular home wished by the church); *Grosz v. City*

47

Here, Lighthouse has not placed any evidence in the record that the inability to locate its premises at the Property or within the specific zoning district at issue here would negatively affect its ability to practice its religion. Although it states its mission is to minister to the downtown poor, it does not allege a sincerely held religious belief that it must minister within the Broadway Corridor or that the downtown poor are not equally accessible in nearby areas. Indeed, Rev. Brown agreed at his deposition that he "could move four blocks and still serve the population [he was] concerned about."

We emphasize that, in requiring a plaintiff who asserts a Free Exercise challenge to a land-use regulation to articulate a reason why the inability to occupy a particular location is significant to its belief, we remain cognizant of the Supreme Court's admonition that "courts must not presume to determine the place of a particular belief in a religion . . .." *Smith*, 494 U.S. at 887. *See also Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.") While we do not require a plaintiff to show the burden is *substantial* because we eschew intrusion into the religious

*of Miami Beach*, 721 F.2d 729, 739 (11th Cir.1983) (where plaintiff, head of an Orthodox Jewish sect, could have held prayer meetings in a differently zoned district four blocks from his home, the burden on his right to exercise his religion was "toward the lower end of the spectrum" although it might entail some impact in terms of "convenience, dollars or aesthetics").

48

realm, we do expect a plaintiff to articulate why it is a burden *on its religious exercise* (as opposed, for instance, to its pocketbook or its convenience). *See Braunfeld v. Brown*, 366 U.S. 599, 606-7 (1961) (holding that a Sunday-closing law did not burden the exercise of religion by Orthodox Jewish merchants since "requiring "some financial sacrifice" from believers is not of the same order as making a religious practice unlawful in itself.)

This requirement is in line with our holding in *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir.2000) (en banc) that the two prerequisites for finding that a religious practice is entitled to protection are that "the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things." While we do not question that the act of assembling for prayer or worship is religious in nature, we do not assume, without any allegation in this sense on the part of the plaintiff, that obtaining use of the particular property at issue here has any religious significance. This alone would be reason to affirm the District Court's grant of summary judgment to Long Branch on the Free Exercise claim.

### 2. Is the Redevelopment Plan a Neutral Law of General Applicability?

Even if Lighthouse were able to show that the Plan burdened its free exercise of religion in a constitutionally cognizable way, the Plan would be subject to strict scrutiny only if it were not a neutral, generally applicable law. *Smith*, 494 U.S. at 878-79. *See also San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) (neutrality

49

and general applicability analysis is appropriate with respect to zoning ordinances as well as other kinds of regulations.) We hold that it is neutral and generally applicable.

A law is not neutral if it has as its "object . . . to infringe upon or restrict practices because of their religious motivation." *Lukumi,* 508 U.S. at 533. A law is not generally applicable when it "proscribes particular conduct only or primarily when religiously motivated." *Tenafly*, 309 F.3d at 165.

The Plan is clearly neutral; there is no evidence that it was developed with the aim of infringing on religious practices, and, unlike the ordinances examined in *Lukumi* which allowed animal killing for a number of secular reasons but not as part as a religious ritual, it does not reveal a value judgment that religious reasons for assembling are less important than secular reasons. *See Lukumi*, 508 U.S. at 537-38.

Lighthouse argues, however, that the Redevelopment Plan is not generally applicable for two reasons: first, because it allows categorical exemptions for secular, but not religious, conduct, and, second, because it allows individualized, discretionary exemptions to its general rule.

Lighthouse's position is not persuasive. In order even to frame the analysis in these terms, one would have to understand the Plan as announcing a general rule of "no assemblies" (or perhaps "no occupancy of any kind") which is then immediately undermined by the grant of numerous secular exemptions. The relevant question is whether the local government pursued its aims evenhandedly, generally allowing the kinds of uses that

50

would further the legislative goals and prohibiting the uses that would interfere with them. This is consistent with the Free Exercise jurisprudence of the Supreme Court and of this Court.

So considered, the Plan is generally applicable despite its allowance of certain categories of secular assemblies because, as explained above, its prohibition applies evenly to all uses that are not likely to further Long Branch's goal of a revitalized, "vibrant" and "vital" downtown. In this sense the Plan is not at all like the web of ordinances the Supreme Court held unconstitutional in *Lukumi*. Here, in addition to churches, the Plan does not allow some of the most important forms of civil assembly: government buildings (which would be unlikely to generate the late-hours traffic Long Branch wishes to encourage) and schoolhouses (which would be subject to the 200-foot liquor-license-free zone). The uses it does allow – restaurants, theaters, bars, clubs, retail shops – are likely to further its aims, not harm them.

We equally decline to hold that every zoning ordinance that includes a waiver or amendment provision is, solely by virtue of that fact, unconstitutional unless it can survive strict scrutiny, as this does not reflect existing precedent of the Supreme Court or of this Circuit and would be untenable as a practical matter.

In arguing that the presence of an amendment procedure subjects the Plan to strict scrutiny, Lighthouse quotes our statement in *Blackhawk* that "a law must satisfy strict scrutiny if it permits individualized, discretionary exemptions because such a regime creates the opportunity for a facially neutral and

51

generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk*, 381 F.3d at 209 (internal citations omitted.) It is true that in *Blackhawk* we summarized the rule in these terms; however, this formulation is perhaps an overstatement.

The significance for Free Exercise purposes of whether a law includes a system of individualized exemptions can be traced back to the Supreme Court's opinion in *Smith*. There, the Court distinguished a generally applicable criminal statute from the kinds of unemployment benefits determinations at issue in earlier Free Exercise cases by noting that "the 'good cause' standard [embodied in the unemployment benefits rules] created a mechanism for individualized exemption," i.e., a system of "individualized assessment of the *reason* for the relevant conduct," then stated that its "decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith*, 494 U.S. 872 at 884 (emphasis added). What makes a system of individualized exemptions suspicious is the possibility that certain violations may be condoned when they occur for secular reasons but not when they occur for religious reasons. In *Blackhawk*, it was not the mere existence of an exemption procedure that gave us pause but rather the fact that the Commonwealth could not coherently explain what, other than the religious *motivation* of Blackhawk's conduct, justified the unavailability of an exemption. *See Blackhawk*, 381 F.3d at 211.

We are persuaded by the Tenth Circuit's approach to this

52

issue. In *Grace United Methodist Church*, 451 F.3d 643, the court held that "although zoning laws may permit some individualized assessment for variances, they are generally applicable if they are motivated by secular purposes and impact equally all land owners in the city seeking variances." *Id.* at 651. A zoning ordinance including a provision that certain enumerated uses "may be permitted by the board" was nonetheless a neutral law of general applicability, where (1) there was no evidence that "the ordinance was passed due to religious animus," (2) there was no evidence that the regulation was discriminatorily enforced against religious institutions, and (3) there was no evidence that the ordinance "devalue[d] religious reasons by judging them to be of lesser import than nonreligious reasons." *Id.* at 653-54, 655.

The application of the Tenth Circuit's test to Long Branch's Plan confirms that the existence of an amendment procedure does not make the Plan less than generally applicable. Although the guidelines for amendment are somewhat vague, requiring a two-level review and the final production of an "ordinance [that] shall specify the relationship of the proposed changes or amendments to the City Master Plan and the goals and objectives of the Redevelopment Plan," Long Branch has identified a procedure that does not involve a value judgment on the reason for the amendment.

We therefore find the Plan to be a neutral law of general applicability not subject to strict scrutiny.

53

### 3. Does the Redevelopment Plan Survive Rational Basis Review?

As a neutral, generally applicable law, the Plan is not subject to strict scrutiny. Even if Lighthouse had shown that the Plan incidentally burdened its right to free exercise of religion, it would only have to satisfy rational basis review in order to be deemed constitutional.

"[I]f [a] zoning law only incidentally burdens the free exercise of religion, with the law being both neutral and generally applicable, it passes constitutional muster unless the law is not rationally related to a legitimate government interest." *San Jose Christian College*, 360 F.3d at 1031. Under rational basis review, "[a] statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not that basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 321 (1993) (internal citations and quotation marks omitted). The regulation must be reasonable and not arbitrary and it must bear "a rational relationship to a [permissible] state objective." *Belle Terre v. Boraas*, 416 U.S. 1, 8 (1974). The same analysis applies here to the Plan; the Plan is valid under rational basis review.

## IV. <u>Conclusion</u>

For the reasons stated above, we will affirm in part and vacate in part the judgment of the District Court. We will affirm the District Court's entry of summary judgment for the City of Long Branch as to Lighthouse's Free Exercise Clause

54

challenges both to the Ordinance and to the Plan and as to its challenge to the Plan under RLUIPA's Equal Terms provision. However, we will vacate the District Court's entry of summary judgment for Long Branch on Lighthouse's facial challenge to the Ordinance under RLUIPA's Equal Terms Provision and remand for further proceedings consistent with this opinion.

JORDAN, *Circuit Judge, Concurring in part and Dissenting in part*

This case presents two related questions: first, whether zoning ordinances of the City of Long Branch, New Jersey ("Long Branch" or the "City") that prohibit churches while permitting the establishment of places for secular assemblies such as theaters, cinemas, and lecture halls constitute a violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA" or the "Act"), 42 U.S.C. §§ 2000cc *et seq.*; and second, whether those same ordinances constitute a violation of the First Amendment's guarantee of the Free Exercise of Religion. In less legalistic language, we are asked whether religion can be made to take a back seat to a City's economic development goals. My colleagues in the Majority say it can. On this record and on the basis of the Act, I must disagree and therefore respectfully dissent from that portion of the Majority's judgment affirming summary judgment for the City. I do agree, however, with the Majority's conclusion that the earlier of the ordinances at issue violated RLUIPA and therefore concur with the judgment to that extent. Because I believe the case can be decided strictly on statutory grounds, I do not reach the constitutional issues except to the extent that they are embodied in the Act.

## I. Factual and Procedural Background[18]

The Lighthouse Institute for Evangelism, Inc. is a New Jersey nonprofit corporation formed in 1991 and led by Reverend Kevin Brown, an ordained Baptist minister.[19] Lighthouse's mission is to minister to its congregation in keeping with Christian doctrine, to operate a school for those interested in joining the ministry, and to provide a variety of benevolent services to the community in which it has operated and seeks to operate. On March 1, 1992, Lighthouse began its work in rented space on 159 Broadway in Long Branch by holding Bible study classes and public prayer meetings. In the years since, it has also provided daily meals for the poor, as well as job placement and substance abuse counseling. Lighthouse deliberately chose to establish itself in a community "where nearly one quarter of the households ... earn[ed] under $15,000 a year" so that it could provide services where it perceived the

---

[18] While I generally agree with the background information set forth in the majority opinion, I provide the following as further context for my perspective on the case. Because we are reviewing an appeal of a grant for summary judgment, I present the facts in the light most favorable to the plaintiffs, against whom the order was entered. *Lindsey v. Caterpillar, Inc.*, 480 F.3d 202, 205 (3d Cir. 2007).

[19] As did the Majority, I will, for brevity, hereafter refer to Lighthouse and Reverend Brown collectively as "Lighthouse" unless otherwise noted.

needs were most acute. (Plaintiffs-Appellants' Appendix ["PA"] 27.)

On November 8, 1994, Lighthouse purchased an abandoned building across the street from its rented location, at 162 Broadway, and planned to continue its mission there. When it purchased the property, it believed it had the support of the City. The City's mayor had voiced his support on many occasions, had written a congratulatory letter to Reverend Brown after the purchase, and had awarded Lighthouse a mini-grant "for the expansion of [its] soup kitchen and related facilities to new quarters."[20] (PA 63 (emphasis removed).)

The 162 Broadway property is located in a part of the City once known as the C-1 Central Commercial District, as designated by Long Branch Ordinance 20-6.13 (the "C-1 Ordinance"). The C-1 Ordinance did not list churches as one of the "permitted uses" within the C-1 district, but it did list, among other things, restaurants, post-secondary educational institutions, assembly halls, bowling alleys, motion picture theaters, municipal buildings, health spas, gyms, barber shops, and beauty salons. (PA 81-83.) Lighthouse claims that, soon after it acquired the property on 162 Broadway, the City restrained it from performing its mission, despite having allowed it to do so for years when it rented space across the street. On August 1, 1995, Lighthouse submitted an application for a

---

[20] According to Lighthouse, it never received those funds because the newly constituted city council that took office in July of 1994 voted to retract the mini-grant.

variance to the City Planning Board to operate a soup kitchen and counseling center and to provide missionary outreach, job skills training, Bible classes, and life skills classes.[21] The City deemed the application incomplete, saying it was not completely filled out, the fees were not paid, and the plans and survey submitted with it were not sealed.

This was an early round in what Lighthouse claims was a concerted effort by the City to thwart Lighthouse's attempt to obtain a variance, an effort Lighthouse says was characterized by the City's stalling Lighthouse's application with technical requests, failing to put it on the City's agenda when Lighthouse met the technical requests, and failing to consider Lighthouse's request for a waiver of fees on account of its nonprofit status.[22]

_____

[21] According to the Majority, Lighthouse first sought approval to use its property as a church in April of 2000. Maj. Op. at 7. While not wanting to argue semantics, the purposes for which Lighthouse sought to use its property in its 1995 application include uses that one could fairly say indicate that Lighthouse was seeking land use approval as a "church." Since the City in 1997 denied use of the property for, among other things, "church services" (PA 509), it is clear that the City understood Lighthouse was trying to operate as a church before April of 2000.

[22] Lighthouse describes its views of the bureaucratic run around as follows:

Right from the outset to the very present, the Mission's

59

Indeed, according to Lighthouse, the City's Director of Community Development was plain enough to state that the City "was never going to allow [Lighthouse] to use 162 Broadway." (PA 31.) Lighthouse asserts that Reverend Brown met with

---

Application became ensnared in "the Loop", with the Loop being defined as the Long Branch's bureaucracy's concerted endeavor designed to frustrate, discourage, and ultimately thwart the Mission's efforts to gain use, by among other things:

a. continually restraining the Mission from performing its ministerial functions at 162 Broadway;

b. exhibiting deliberate indifference to the Mission's Application by allowing it to languish;

c. stalling the Mission's Application with hyper technical requests, and then when these requests were fulfilled, still failing to place the Application on the 'agenda';

d. failing to consider the Mission's request for a waiver of fees on account of the Mission's non-profit status (a common practice when the applicant is a charitable organization);

e. not granting use, thus preventing the Mission from obtaining its constitutionally guaranteed tax exemption; and

f. attempting to harass and intimidate the Mission and Rev.Brown through the constant issuance of various summonses for alleged code violations, as well as other forms of continual harassment.

(PA 30 at ¶ 25.)

60

officials from an organization called Pendar Development ("Pendar") to find an alternative location to pursue its mission. Pendar agreed to approach the City to discuss the possibility of allowing Lighthouse to relocate to a former nursing home. According to Lighthouse, the City told Pendar and Reverend Brown after several meetings that it would work with Pendar to develop the property on the condition that Pendar "dropped its affiliation with Rev. Brown." (PA 31.)

On March 26, 1997, Lighthouse applied for a zoning permit to use the property as offices for Lighthouse personnel. The City granted the zoning permit, but specified that the property could not be used for "church services/soup kitchen/classes." (PA 509.) On April 26, 2000, Lighthouse applied for a zoning permit to use the building as a church. The zoning officer denied the application the next day because the proposed use was not permitted in the C-1 zone without a variance.

On June 8, 2000, Lighthouse and Reverend Brown filed a complaint against the City in the Superior Court of New Jersey. The City subsequently removed the action to the United States District Court for the District of New Jersey. On October 23, 2000, Lighthouse filed an amended complaint alleging, among other things, violations of the Free Exercise Clause and the then-newly enacted RLUIPA.[23] On March 13, 2001, Lighthouse filed a motion seeking a preliminary injunction to

---

[23] RLUIPA was signed into law on September 22, 2000. Pub. L. No. 106-274, 114 Stat. 803-806.

compel the City to grant Lighthouse's zoning permit application. The District Court denied Lighthouse's motion.

Lighthouse appealed the District Court's denial of its motion for a preliminary injunction and this Court, in a non-precedential opinion, affirmed. *The Lighthouse Inst. for Evangelism Inc. v. The City of Long Branch*, 100 Fed. App'x 70, 73 (3d Cir. 2004). Regarding Lighthouse's RLUIPA claim, we stated that, because Lighthouse "did not show that it would be prohibited from operating in the district if it applied under the 'assembly hall' category, it could not show that the [C-1] Ordinance, on its face, treated it on less than equal terms than a nonreligious assembly." *Id.* at 77.[24] We also stated that Lighthouse had failed to produce any evidence that the nonreligious assemblies it identified were similarly situated "such that a meaningful comparison could be made" under the provision of RLUIPA that forbids treating religious and non-religious assemblies on less than equal terms. *Id.* As support for that statement, we cited a case decided under the Equal Protection Clause of the Fourteenth Amendment. *Id.* (citing *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 125 (3d Cir. 2002)).

In the meantime, while Lighthouse's motion for a preliminary injunction was pending in the District Court, the City changed the applicable zoning ordinances. On October 8,

---

[24] The City has since admitted in an interrogatory that, under the C-1 Ordinance, the term "assembly hall" did not include Houses of Worship.

2002, the City passed redevelopment ordinance 47-02 (the "Redevelopment Plan" or, as the Majority refers to it, the "Plan") pursuant to N.J.S.A. § 40A:12A. The Redevelopment Plan superseded the "applicable provisions of the development regulations of the municipality or constitute[d] an overlay zoning district within the redevelopment area." N.J.S.A. § 40A:12A-7(c). The City's stated purpose in adopting the Redevelopment Plan was to "achieve redevelopment of an underdeveloped and underutilized segment of the City" by, among other things, strengthening retail trade and city revenues, increasing employment opportunities, improving the city's image, and attracting more retail and service enterprises. (PA 87-88.) To achieve those goals, the City planned to "establish a center for the arts that [would] attract artists from the whole region" and "restore lower Broadway[, i.e., the 'Zone'], traditionally the downtown of Long Branch, as the principal commercial district of the city." (PA 95, 97.) The City wanted to accommodate "rich and varied uses" in the Zone, to stimulate retail in all areas, and to have a "diversity of attractions" to "bring people together from all parts of Long Branch and neighboring communities." (PA 97.) The Redevelopment Plan listed the kinds of entities the City wanted in the Zone, such as theaters, cinemas, dance studios, culinary schools, music instruction centers, theater workshops, fashion design schools, art studios, restaurants, bars and clubs, book stores, and craft stores. (*Id*.) Churches did not make the cut. Evidently, "rich and varied uses" were not seen to include religious devotions. Since churches were not on the list of desirable downtown entities, the Redevelopment Plan prohibited them.

63

The Plan created new application requirements for development within the affected areas. Under those new requirements, no property could be developed in the Zone until a Request for Qualification ("RFQ") and a Request for Proposal ("RFP") had been approved by the City Council.[25] While no formal procedure for individualized zoning waivers was included in the Plan itself, there is evidence to suggest that the City Council did, as in this instance, at least consider waivers with respect to the Plan, (*see* PA 231 ("Now, therefore, be it resolved, by the City Council of the City of Long Branch that the application for a waiver of the Redevelopment Plan to allow houses of worship in the entertainment/commercial section of the Redevelopment Zone 6 in lower Broadway is denied.")), and, of course, the City Council had the power to amend the Plan.

On November 11, 2003, Lighthouse submitted an RFQ and application to develop its property as a church. On December 23, 2003, the Redevelopment Council of the City of Long Branch notified Lighthouse that its application had been rejected because the "proposed church use did not comport with the Redevelopment Plan and would in fact disrupt the zone." (PA 226.) Lighthouse appealed that decision to the Mayor and City Council and, at the same time, sought to have the Redevelopment Plan amended to allow houses of worship in the

_____

[25] As noted by the Majority, an RFQ requires applicants to describe the development team members' qualifications, experience, and financial capacity. An RFP requires a detailed description of the project to be undertaken.

64

Zone or, alternatively, to obtain a waiver of the prohibition of church use.

After administrative hearings, the City Council voted unanimously to deny the waiver and application because churches were not permitted in the Zone and because the RFQ was "sketchy" with respect to project funding, scope, aesthetics and design, and plans for parking. **(**PA 226, 232.**)** The City Council determined that granting a waiver would have a "detrimental effect on the zoning planned for the area which was to be an entertainment/commercial zone with businesses that are for profit." (PA 227.) As emphasized by my colleagues in the Majority, one problem the City perceived is that a state statute and a municipal ordinance prohibit the City from issuing liquor licenses to businesses within the vicinity of a church. Consequently, according to the City, allowing Lighthouse in the Zone "would destroy the ability of the block to be used as a high end entertainment recreation area." (PA 229.) The City reached that conclusion despite a provision in the state statute allowing a church to waive its rights under the statute,[26] despite

---

[26] N.J.S.A. § 33:1-76 provides that the "protection of this section may be waived at the issuance of the license and at each renewal thereafter, by the duly authorized governing body on authority of such church ..., such waiver to be effective until the date of the next renewal of the license." And, if the "license has been ... renewed on authority of annual waivers by the church ... for 15 or more consecutive years, the holder of such license shall thereafter be entitled to apply for renewal or reissuance thereof without ... [a] waiver ... of the church ... ." N.J.S.A. §

Lighthouse's express agreement to waive those rights in perpetuity if allowed to establish a church within the Zone, and despite the City's apparent failure to enforce its own ordinance in any meaningful way.[27]

On July 26, 2004, Lighthouse amended its complaint to add statutory and constitutional challenges to the Redevelopment Plan. On December 27, 2005, the District Court

---

33:1-76.2.

[27] According to the City's brief, the City has its own alcoholic beverage ordinance that prohibits the sale of alcoholic beverages within one thousand feet of a religious organization and prohibits the issuance of a license within one thousand feet of another establishment with a license. (Appellee's Brief at 32, 41.) However, the parties have not submitted a copy of the ordinance for the record, or even a citation to it, and Lighthouse disputes its existence. The City's assistant planning director and acting zoning officer testified that it was possible there were churches in the City within a thousand feet of an entity with a liquor license. In fact, the City has conceded in its brief that it issued waivers with respect to the part of the alcoholic beverage ordinance that prohibits the issuance of a license within one thousand feet of another establishment with a license. In addition, the City admitted at oral argument that it was "relaxing" its enforcement of its alcohol laws in the Zone to promote the goals of the Redevelopment Plan. I agree with the Majority, Maj. Op. at 12 n.7, that, under these circumstances, the City's alcoholic beverage ordinance warrants no consideration.

granted summary judgment for the City on all of Lighthouse's claims. *The Lighthouse Inst. for Evangelism, Inc. v. The City of Long Branch*, 406 F. Supp. 2d 507, 524 (D.N.J. 2005). On appeal now are the District Court's conclusions regarding the alleged violations of section 2(b)(1) of RLUIPA, 42 U.S.C. § 2000cc(b)(1) ("section 2(b)(1)") and the Free Exercise Clause.

## II. Analysis

In my view, both the C-1 Ordinance and the Redevelopment Plan are unlawful. Since my colleagues in the Majority and I are in agreement that the C-1 Ordinance violated RLUIPA, my analysis is focused primarily on the Redevelopment Plan and its shortcomings under RLUIPA. I do not reach the question of whether the C-1 Ordinance and the Redevelopment Plan also violate the Free Exercise Clause because Lighthouse ought to obtain full relief under the statute. *See Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.").

Section 2(b)(1) of RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). It is uncontested that the City is a "government" within the meaning of the statute, that the C-1 Ordinance and the Redevelopment Plan are "land use regulations" within the meaning of the statute, and that churches are "religious assembl[ies] or institution[s]" that are

67

treated differently than nonreligious assemblies or institutions under the City's land use regulations. *See* Maj. Op. at 21. Nevertheless, the District Court granted summary judgment in favor of the City with respect to Lighthouse's section 2(b)(1) claim. As accurately described by the Majority, the District Court concluded that Lighthouse had failed to demonstrate that the City imposed a substantial burden on the free exercise of religion and that Lighthouse had failed to show it was similarly situated to nonreligious assemblies receiving more favorable treatment from the City. The City now argues that, in addition to the grounds the District Court relied upon, summary judgment was appropriate on Lighthouse's section 2(b)(1) claim because the land use ordinances are neutral and generally applicable. The City also argues that, even if it did treat Lighthouse on less than equal terms than nonreligious assemblies, it had a compelling government interest for doing so and that the means it used were narrowly tailored to meet that interest.

The City's arguments are not well founded, and neither is the District Court reasoning that the City attempts to defend here. With all respect to the District Court and its work on this challenging case, and likewise with due regard for my colleagues who have wrestled with the case on this and the previous appeal, I believe the District Court undertook an analysis that is neither warranted by the text of the statute nor compelled by any concern regarding the statute's constitutionality, and I further believe that some measure of the responsibility for that error lies in our earlier opinion, to the extent it encouraged the District Court to read into

68

RLUIPA a "similarly situated" analysis imported from equal protection jurisprudence.

Nevertheless, I do not find myself totally at odds with the Majority's opinion on this latest round in the dispute. I agree with the Majority that the District Court should not have grafted onto section 2(b)(1) a "substantial burden" requirement. I also agree that the District Court erred by holding that, for Lighthouse to prevail on its 2(b)(1) claim, Lighthouse had to show that it was treated on less than equal terms than a secular counterpart so similarly situated that both entities, the religious and the secular, involved exactly the same combination of land uses. I acknowledge, as does the Majority, the need for some kind of comparator. That is, of course, inherent in the concept of "less than equal terms," which implies a comparison. But, unlike the Majority, I do not believe the statute requires any greater similarity than is inherent in the broad terminology "assembly or institution," i.e., the terminology of the statute itself. The correct analysis should begin and, to the extent possible, end with the language of the statute. Since the text of both the C-1 Ordinance and the Redevelopment Plan treats churches differently than nonreligious assemblies or institutions, I would reverse the District Court's grant of summary judgment for the City and direct that judgment be entered in favor of Lighthouse on its RLUIPA claim.[28]

---

[28] The District Court denied Lighthouse's cross-motion for summary judgment on its claims under RLUIPA at the same time it granted the City's motion for summary judgment.

69

### A. Section 2(b)(1) of RLUIPA Does Not Require Plaintiffs to Demonstrate a Substantial Burden on Religious Exercise

As previously noted, I agree with the Majority that, for reasons they cite and I will not repeat, section 2(b)(1) does not require Lighthouse to demonstrate a substantial burden on religious exercise. When interpreting a statute, the starting point is to determine if the language is plain and unambiguous, "for '[i]f the intent of Congress is clear, that is the end of the matter.'" *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) (quoting *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc*., 467 U.S. 837, 842 (1984)). Section 2(b)(1) very simply prohibits zoning regulations that treat religious assemblies or institutions "on less than equal terms" than secular assemblies or institutions. 42 U.S.C. § 2000cc(b)(1). It is a spare and straightforward statute. Congress included no language in section 2(b)(1) indicating that a plaintiff must demonstrate a substantial burden on religious exercise to obtain relief, and I can discern no constitutionally compelled basis for reading that requirement into that subsection of the statute.

### B. Section 2(b)(1) of RLUIPA Addresses the Neutrality and General Applicability of a Challenged Ordinance Within the Framework of a "Less than Equal Terms" Analysis

---

*Lighthouse*, 406 F. Supp. 2d at 524.

In my view, the appropriate analysis to undertake in deciding whether the City's imposition or implementation of the challenged ordinances violates section 2(b)(1) of RLUIPA requires three steps. First, we should determine whether each of the challenged ordinances is a land use regulation. Second, though it is in this instance self-evident and not seriously disputed, we should decide whether Lighthouse is a religious assembly or institution. Third, we should decide whether the City's enactment or implementation of the challenged ordinances results in Lighthouse being treated on less than equal terms with a nonreligious assembly or institution.

No one contests that the C-1 Ordinance and the Redevelopment Plan are land use regulations. Nor is there any legitimate contention that Lighthouse is not a religious assembly or institution.[29] The parties further agree that

---

[29]As the Eleventh Circuit has recognized, Congress did not define the terms "assembly" or "institution" in the statute. *Midrash Shepardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230 (11th Cir. 2004). Accordingly, we should construe the statutory terms "in accordance with [their] ordinary or natural meaning[s]." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476 (1994). An "assembly" is defined as "a company of persons gathered together for deliberation and legislation, worship, or entertainment," *Merriam-Webster's Collegiate Dictionary* 69 (10th ed. 2002), or as "[a] group of persons organized and united for some common purpose." *Black's Law Dictionary* 111 (7th ed. 1999). An "institution" is "an established organization or corporation ... esp. of a public character." *Merriam-Webster's*

several of the permitted uses under both the Ordinance and the Plan constitute nonreligious assemblies. Thus, the dispute in this case is whether the City's instituting or implementing of the challenged ordinances has resulted in Lighthouse being treated "on less than equal terms" with one of the permitted nonreligious assemblies.

The Eleventh Circuit has identified three distinct ways in which a government's enactment or implementation of a land use regulation might result in a religious assembly being treated "on less than equal terms":

> (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is

_____

*Collegiate Dictionary* 605 (7th ed. 1999); *see also Black's Law Dictionary* 801 (7th ed. 1999) (defining "institution" as "[a]n established organization, esp. one of a public character"); *see also Midrash*, 366 F.3d at 1230-31 (defining both "assembly" and "institution" in a manner consistent with the foregoing dictionary definitions).

The City asserts that Lighthouse has not "produced evidence to show that it is an assembly," (Appellee's Brief at 30); however, the City cannot seriously contend that Lighthouse is not a religious assembly when one of the reasons it denied Lighthouse's RFQ application was because the "proposed church use did not comport with the redevelopment plan ... ." (PA 226.)

72

nevertheless 'gerrymandered' to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious assemblies or institutions.

*Primera Iglesia Bautista Hispana v. Broward Cty.*, 450 F.3d 1295, 1308 (11th Cir. 2006).

In *Midrash Shepardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004), the Eleventh Circuit confronted the first situation: a statute that, on its face, differentiated between religious assemblies and nonreligious assemblies. There, the town of Surfside had a zoning ordinance that permitted theaters, restaurants, private clubs, lodge halls, health clubs, dance studios, music instruction studios, modeling schools, language schools, and schools of athletic instruction in the town's business district, but that did not permit churches or synagogues. *Id.* at 1220.[30] Because

[30] Similar to this case, the town alleged that it designed its zoning ordinances "in part to invigorate [its] business district and to create a strong tax base" through retail establishments. *Id.* at 1221. The business district, the town claimed, was vital to its tax base, job base, and its ability to serve the needs of the residents. It asserted that allowing religious institutions in that district would contribute little synergy to retail shopping areas, disrupt the continuity of retail environments, erode its tax base, jeopardize its economic stability, and eventually result in

73

churches, synagogues, private clubs, and lodges all fell under
the definition of "assemblies" or "institutions," and because
Surfside permitted private clubs and other secular assemblies
in the business district but categorically excluded synagogues
and other religious assemblies, the court held that the town's
zoning ordinance, on its face, violated section 2(b)(1).  *Id.*  at
1231.  Indeed, the court noted that the legislative history
indicated that section 2(b)(1) "was intended to apply in
*precisely* the situation [it was addressing]."  *Id.* at 1231 n.14;
*see also* 146 Cong. Rec. S7774 (2000) (joint statement of Sen.
Hatch and Sen. Kennedy) ("Zoning codes frequently exclude
churches in places where they permit theaters, meeting halls,
and other places where large groups of people assemble for
secular purposes.").

The facts of this case bear a striking resemblance to
those in *Midrash*.  Here, the texts of the challenged
ordinances permit schools, assembly halls, gyms, theaters,
cinemas, restaurants, and bars and clubs, all of which qualify
broadly as assemblies or institutions because people gather in
those places to be entertained or educated or to otherwise
organize themselves for some common purpose.[31]  Religious

---

economic hardship on the residents.  *Id.*

[31] Not all of these entities were permitted under both
ordinances, although there is substantial overlap.  The C-1
Ordinance allowed establishments such as restaurants,
educational institutions, assembly halls, bowling alleys, motion
picture theaters, municipal buildings, health spas, and gyms. **(PA**

assemblies, such as churches and synagogues, are not permitted under either ordinance.[32]  Like the Eleventh Circuit in *Midrash*, I conclude that such differential treatment on the face of both the C-1 Ordinance and the Redevelopment Plan constitutes a violation of section 2(b)(1).  Put simply, churches are treated "on less than equal terms" than the permitted nonreligious assemblies because churches are categorically prohibited.[33]  The City here may have a

81-83.**)** The Redevelopment Plan permits establishments such as theaters, cinemas, dance studios, culinary schools, music instruction, theater workshops, fashion design schools, art studios, restaurants, and bars and clubs.  **(PA 97.)**

[32] Neither ordinance explicitly states, "Churches are forbidden"; however, churches are plainly prohibited by both ordinances because churches are  not listed by either as a permitted use.  Indeed, the City denied Lighthouse's April 2000 application to use the Property as a church because churches were not permitted in the C-1 zone, and the City denied Lighthouse's December 2003 application because "church use did not comport with the Redevelopment Plan."  (PA 226.) Both the text of each ordinance and the City's expressions of its own understanding of that text make it clear that churches, as a category, are not permitted.

[33] Because the challenged ordinances, on their faces, differentiate between religious and nonreligious assemblies or institutions, there is no need to examine whether the ordinances are unlawful in either of the other manners identified by the

75

laudatory redevelopment aim, but, as in *Midrash*, that does not save the City's actions from being unlawful.[34]

---

Eleventh Circuit. *See Primera Iglesia,* 450 F.3d at 1311. It is noteworthy, however, that Lighthouse has presented evidence that the city's zoning ordinances were selectively enforced. In other words, Lighthouse has proffered evidence that the challenged ordinances were implemented in a manner that treated Lighthouse on less than equal terms with other, secular assemblies. I am not suggesting that, in fact, the City's leaders bore a grudge against Lighthouse and Reverend Brown. That may ultimately be a question for a finder of fact. I simply note that there is evidence to support Lighthouse's assertion that the City deliberately put the Reverend and his church on the bureaucratic equivalent of an Escher staircase, creating and enforcing an endlessly recursive zoning procedure to prevent Lighthouse from ever opening its doors at 162 Broadway. I believe there is a basis in the record to conclude that the City simply didn't want this religious group downtown, ever, and therefore there is an additional reason that summary judgment was improper.

[34] The Majority concludes that violations of section 2(b)(1) of RLUIPA do not receive strict scrutiny; instead, it holds that RLUIPA imposes a strict liability standard. I do not think it necessary to decide in this case whether section 2(b)(1) imposes strict liability under all circumstances because, at least with respect to a zoning ordinance that, on its face, treats religious assemblies on less than equal terms, strict scrutiny, no less than strict liability, will result in liability. *Cf. Church of the Lukumi*

The Majority and the District Court each reject the Eleventh Circuit's approach in *Midrash* because they apparently fear it interprets RLUIPA so broadly as to make rational zoning impossible whenever a church is in the mix. Contrary to those concerns, however, the Eleventh Circuit's interpretation of section 2(b)(1) does not prohibit governments from applying zoning restrictions to churches. For one thing, an ordinance prohibiting churches in a zone would not likely violate section 2(b)(1) if nonreligious assemblies and institutions were also prohibited. *See Konikov v. Orange County*, 410 F.3d 1317, 1325-26 (11th Cir. 2005) (holding that a zoning ordinance permitting "model homes" and "home occupations" in a residential zone but prohibiting synagogues and church services did not, on its face, violate section 2(b)(1) because "model homes" and "home occupations" did not qualify as "assemblies or institutions").

Again, contrary to the Majority's claim, the Eleventh Circuit's interpretation of section 2(b)(1) does not "give any and all religious entities a free pass to locate wherever any secular institution or assembly is allowed." Maj. Op. at 34. The Majority hypothesizes that,

---

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) ("A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases.").

under the Eleventh Circuit's interpretation, if a town allows a local, ten-member book club to meet in the senior center, it must also permit a large church with a thousand members – or, to take examples from the Free Exercise caselaw, it must permit a religious assembly with rituals involving sacrificial killings of animals or the participation of wild bears – to locate in the same neighborhood regardless of the impact such a religious entity might have on the envisioned character of the area.

*Id*. This parade of horribles has the benefit of some "lions and tigers and bears, oh my!" shock value, but I do not read RLUIPA as somehow preventing a city from including in its zoning ordinances rational terms restricting the use of land, as long as those terms apply equally to religious assemblies and nonreligious assemblies. *See Digrugilliers v. Consolidated City of Indianapolis*, No. 07-1358, 2007 WL 3151201, at *2 (7th Cir. Oct. 30, 2007) ("Whatever restrictions the City imposes on other users of land in [its C-1 commercial district] it can impose on the Baptist Church of the West Side without violating the 'equal terms' provision.").

For example, a large church might lawfully be prohibited from locating in a neighborhood by an ordinance regulating the physical size of buildings. *See, e.g., Vision Church, United Methodist v. Village of Long Grove*, 397 F. Supp. 2d 917, 930 (N.D. Ill. 2005) (holding that a zoning ordinance restricting building size did not violate section 2(b)(1) because the ordinance applied equally to religious and

78

nonreligious institutions), *aff'd on other grounds*, 468 F.3d 965 (7th Cir. 2006). Moreover, while I have not found any cases explicitly addressing the point, no one that I am aware of has suggested that section 2(b)(1) prevents a city from prohibiting either animal slaughter or the possession of wild bears in a zone. If a city wanted to, it could properly enact a zoning ordinance prohibiting either, as long as the ordinance applied equally to religious assemblies and nonreligious assemblies.[35]

In this case, however, the applicable ordinances do not treat religious assemblies and nonreligious assemblies on equal terms. Instead, religious assemblies are categorically prohibited. Holding that these ordinances violate section 2(b)(1) does not give religious entities "a free pass." It does nothing more than reach exactly the result Congress intended. *See* 146 Cong. Rec. at S7774 ("Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes ... . Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes.").

Nevertheless, the City argues, and the Majority accepts, that the City did not treat Lighthouse on less than

---

[35] Of course, to comply with the requirements of the Free Exercise Clause, such a law must also either be neutral and generally applicable or withstand strict scrutiny. *See Lukumi*, 508 U.S. at 531-32.

equal terms with nonreligious assemblies and institutions because the zoning ordinances at issue are "neutral and generally applicable." I fundamentally disagree with that characterization of the ordinances, and believe that the City and the Majority have approached the question from the wrong direction.

The "neutral and generally applicable" language is lifted from Free Exercise Clause jurisprudence. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."). While it is true that the legislative history of RLUIPA shows that Congress intended to codify aspects of that jurisprudence, *see* 146 Cong. Rec. at S7776 ("Sections 2(b)(1) and (2) ... enforce the Free Exercise Clause rule against laws that burden religion and are not neutral and generally applicable"), that does not mean Congress meant to simply replicate the analysis that would be undertaken in addressing a Free Exercise claim. Viewing a RLUIPA claim as the precise equivalent of a Free Exercise claim renders the statute superfluous. Congress chose to define a violation under section 2(b)(1) not in terms of an ordinance's lack of neutrality and general applicability but rather in terms of equality of treatment, i.e., whether the ordinance treats a religious assembly or institution "on less than equal terms" with a nonreligious assembly or institution. 42 U.S.C. § 2000cc(b)(1). Again, we should be starting with the text. If we were taking the language Congress chose as the starting point of our analysis, we would not only be

80

faithful to legislative intent, we would avoid the confusion that attends a multiplication of legal tests.

Moreover, to say an ordinance is neutral and generally applicable should be no defense to a charge of unequal treatment. First, it presents a logical contradiction. As the Eleventh Circuit observed in *Midrash*, if a zoning law on its face treats religious and nonreligious assemblies or institutions on less than equal terms, that law is not genuinely neutral or generally applicable, "because such unequal treatment indicates the ordinance improperly targets the religious character of an assembly." 366 F.3d at 1232. Second, it is, in an important sense, beside the point. If the treatment is unequal and the other prerequisites set by the statute have been met, then a claim has been established. Even if one were to find an instance of unequal treatment imposed in accordance with a neutral and generally applicable statute – and, again, I think that akin to an oxymoron – what you would then be dealing with would not be a defense to the charge that a RLUIPA violation had occurred but rather would be an attack on RLUIPA itself, on the grounds that it is unconstitutionally broad, as was the Religious Freedom Restoration Act. *Cf. City of Boerne*, 521 U.S. at 536 ("Broad as the power of Congress is under the Enforcement Clause of the Fourteenth Amendment, RFRA contradicts vital principles necessary to maintain separation of powers and the federal balance."). Since the City never purported to raise a constitutional challenge to the statute, those ramifications of

81

their "neutral and generally applicable" defense were never explored.[36]

---

[36]The Majority takes me to task for advocating an interpretation of section 2(b)(1) that it doubts is constitutional. *See* Maj. Op. at 36-37 n.14. It is noteworthy, however, that no one in this case has challenged the constitutionality of section 2(b)(1), even though the straightforward reading of the statute I propose was expressly advocated by Lighthouse.

Nevertheless, I wish to note that I do not harbor the same degree of skepticism as the Majority regarding the constitutionality of section 2(b)(1) as written. The Supreme Court has recognized that Congress has broad power to enact legislation under section 5 of the Fourteenth Amendment to enforce the constitutional right to the free exercise of religion, a right that applies to state and local governments through the Due Process Clause. *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). That right to enforce does not allow Congress to alter the meaning of the Free Exercise Clause, but it does include the power to enact preventive and remedial legislation. *Id.* at 519, 524. And Congress has "wide latitude" to determine how far it can go in exercising that power. *Id.* at 519-20.

In enacting RLUIPA, Congressional sponsors were endeavoring to avoid constitutional issues raised by the Supreme Court when it struck down portions of the Religious Freedom Restoration Act of 1993 ("RFRA"). *City of Boerne*, 521 U.S. at 519, 532-33. Those sponsors were careful to point out that discrimination against religious entities in the land use context was "a nationwide problem." 146 Cong. Rec. S7774, S7775

82

(2000) (joint statement of Sen. Hatch and Sen. Kennedy). Congress compiled what it characterized as "massive evidence" that "[c]hurches in general, and new, small, or unfamiliar churches in particular, [were] frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation." *Id.* at S7774. The evidence proved to Congress that state and local governments had enacted zoning codes that frequently excluded "churches in places where they permit[ted] theaters, meeting halls, and other places where large groups of people assemble for secular purposes." *Id.* The evidence also demonstrated that government entities frequently allowed churches in those places "only with individualized permission from the zoning board, and zoning boards use[d] that authority in discriminatory ways." *Id.* Congress found that, most often, discrimination against religious entities had lurked behind "vague and universally applicable reasons" such as a concern for aesthetics, or concerns that allowing a church was "not consistent with the city's land use plan," or was not appropriate in commercial zones because churches don't generate business. *Id.* at S7774-75. On the basis of that record, Congress enacted RLUIPA as prophylactic legislation to prevent discrimination against churches in the processes of land use regulation. *See id.* at S7775 (RLUIPA provides "proportionate and congruent responses to the problems documented in this factual record."); *cf. City of Boerne*, 521 U.S. at 530-31 (emphasizing that "[r]emedial legislation under § 5 'should be adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide against.'" (quoting *Civil Rights Cases*, 109 U.S. 3, 13

But, even accepting that the correct analytical approach under RLUIPA is to ask whether the challenged ordinance is "neutral and generally applicable," the Majority does not address the fundamental question in this case. My colleagues state that, "[a] regulation does not automatically cease being neutral and generally applicable ... simply because it allows certain secular behaviors but not certain religious behaviors." Maj. Op. at 26. That may be true in the abstract, but we are not talking about abstractions. We have here two reasonably well-defined sets of proposed uses. If an ordinance on its face permits, indeed encourages, secular assemblies for the purpose of education and entertainment, which is what the ordinances at issue do, I am hard put to say it is neutral and generally applicable when that same ordinance leaves out of the "permitted" category religious assemblies. Many people who attend church services are seeking edification and learning. On what principled basis can an art workshop or a

---

(1883))).

Because Congress developed a record, expressly relied on that record, and endeavored to tailor RLUIPA to meet the constitutional guidance provided by the Supreme Court in *City of Boerne*, I disagree with my colleagues' assertion that interpreting RLUIPA according to its plain language is ill-advised. Moreover, if a constitutional attack on RLUIPA had been mounted and were before us, and we were to conclude that RLUIPA is unconstitutionally broad, the proper result would be to strike it down as unconstitutional, not to re-draft it. *See City of Boerne*, 521 U.S. at 536.

84

cooking class be governmentally preferred to a theological or philosophical discussion in Sunday School?  Many people who attend church services find personal enjoyment and entertainment in the sermons they hear.  Why should Hollywood's latest cinematic offering or a production of a popular Broadway play be governmentally preferred to preaching?  I submit that there is no proper basis for the distinctions made in either the C-1 Ordinance or the Redevelopment Plan.

The City nevertheless defends its unequal treatment of religious assemblies by pointing to the state law that prohibits issuing liquor licenses within a certain distance of religious institutions.[37]  According to the City, if churches were allowed in its Redevelopment Zone, the liquor law would prevent it from turning the Zone into a high-end entertainment district.  New Jersey law, however, cannot take the City off the hook for violating RLUIPA.  RLUIPA is a federal law, and no state or local government can defend against a charge that it has violated federal law on the basis that its actions were required by state law.  Were it otherwise, a state could nullify RLUIPA simply by passing a statute mandating that churches be treated on unequal terms.

Indeed, in *Digrugilliers v. Consolidated City of Indianapolis*, the United States Court of Appeals for the

---

[37] New Jersey state law prohibits the issuance of liquor licenses within two hundred feet of any church.  N.J.S.A. § 33:1-76.2.

Seventh Circuit rejected an identical argument to the one the City makes here. 2007 WL 3151201, at *3-4. There, the city of Indianapolis had a zoning ordinance that permitted assemblies such as auditoriums, assembly halls, community centers, and civic clubs in its C-1 commercial district, but that did not permit churches. *Id.* at *1. Indianapolis defended its discriminatory treatment of churches on the basis of state laws that forbade the sale of liquor within two hundred feet of a church, or pornography within five hundred feet. According to the city, allowing churches in the C-1 district could therefore interfere with other uses in the district. The Seventh Circuit, however, persuasively rejected the argument that the state laws could be a defense to an "equal terms" violation:

> Government cannot, by granting churches special privileges (... the right of the church to be free from offensive land uses in its vicinity), furnish the premise for excluding churches from otherwise suitable districts. ...
> ...
> It is irrelevant that the [two hundred foot and five hundred foot] protective zones ... were commanded by the state, while the exclusion itself was commanded by the City. The City is part of the government of Indiana, and if it would violate the federal Act for the City to exclude churches from C-1 districts–and since the City does not argue that the state is required by the First Amendment to create protective zones around churches–the City may not exclude churches from those districts. For the

86

federal Act treats state and local government interchangeably, 42 U.S.C § 2000cc-5(4)(A)(i), and Indianapolis's power to zone is conferred by state law. . . . [A] state cannot be permitted to discriminate against a religious land use by a two-step process in which the state's discriminating in favor of religion becomes a predicate for one of the state's subordinate governmental units to discriminate against a religious organization in violation of federal law.

*Id.* at *3-4.

Like the city of Indianapolis, the city of Long Branch's power to adopt the C-1 Ordinance and the Redevelopment Plan is conferred by state law. N.J.S.A. § 40:55D-62 (power to adopt a zoning ordinance); N.J.S.A. § 40A:12A-4 (power to adopt a redevelopment plan). The state's liquor law is therefore no defense to a zoning exclusion challenged under section 2(b)(1) of RLUIPA, a federal law. Moreover, the City's argument in this case is deprived of whatever persuasive force a true conflict of laws might provide because the state's liquor law permits churches to waive their rights under the statute,[38] and Lighthouse has expressly agreed to

---

[38] N.J.S.A. § 33.1-76 states that "[t]he protection of this section may be waived at the issuance of the license and at each renewal thereafter, by the duly authorized governing body on authority of such church ... ." The constitutionality of a statute

waive those rights if allowed to establish a church within the Zone.

The City also defends its unequal treatment of religious assemblies on the basis of economics. There are two answers to that. First, the economic rationale lacks credibility because the Plan contains no prohibition on non-profit museums, non-profit theater companies, non-profit educational institutions, or other non-profit organizations. Why such organizations are less likely to "disrupt the zone" than Reverend Brown's church is not apparent. Second, the motive for violating the Act is simply irrelevant. Whatever the reason that secular assemblies, even non-revenue generating ones, are permitted while religious assemblies are forbidden, we are faced with precisely the problem Congress sought to rectify with RLUIPA. An economic rationale is not a license to ignore the lawful will of Congress.

---

of this sort is questionable. *See Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 120-27 (1982).

### C. Section 2(b)(1) of RLUIPA Does Not Require Plaintiffs to Demonstrate That They Are "Similarly Situated"

Because it reasons that a literal interpretation of section 2(b)(1) would lead to results unintended by Congress, the Majority disregards the plain language of the statute and replaces it with a new legal test that requires a religious assembly to identify "a better-treated secular comparator that is similarly situated in regard to the *objectives* of the challenged regulation." Maj. Op. at 35. The Majority reaches this conclusion after examining a number of Free Exercise cases from both this Court and the Supreme Court. As explained above, however, just because Congress intended to codify certain aspects of Free Exercise jurisprudence does not mean that Congress intended to replicate the analysis that would be undertaken in addressing a Free Exercise claim.

Putting that aside, however, the Majority's analysis is misguided for another reason. The cases relied on by the Majority in formulating its new test are inapposite because none of them deal with circumstances in which the face of the challenged law distinguishes between conduct engaged in for religious reasons and conduct engaged in for nonreligious reasons. Instead, in all of those cases one of two circumstances was present: (1) the challenged law, while neutral on its face, had the effect of targeting conduct engaged in for religious, as opposed to nonreligious, reasons, *e.g.*, *Lukumi*, 508 U.S. at 533-35; or (2) the challenged law, while neutral on its face, was selectively enforced against conduct engaged in for religious reasons, *e.g.*, *Tenafly Eruv*

89

*Ass'n v. Borough of Tenafly*, 309 F.3d 144, 167-68 (3d Cir. 2002).

In the first type of case, it may be relevant to compare the proscribed religious conduct with similarly-situated nonreligious conduct in order to support a conclusion that a challenged law, while facially neutral, improperly targets conduct engaged in for religious reasons. For example, in *Lukumi*, the Supreme Court examined facially neutral ordinances that had the effect of prohibiting religiously-motivated animal slaughter by adherents of the Santeria religion while permitting animal slaughter for other reasons. *Lukumi*, 508 U.S. at 533-35. Among the City's justifications for the ordinances were to prevent cruelty to animals and to preserve the public heath; however, the ordinances provided exceptions for secular conduct that implicated those same concerns in the same ways as the proscribed religious conduct. *Id.* at 543-45. By comparing the prohibited religious conduct with permitted conduct that implicated the city's interests in the same ways, the Court was able to conclude that the ordinances pursued the city's interests only against conduct engaged in for religious reasons. *Id.* at 545.

Likewise, in the second type of case–a facially neutral law that is selectively enforced–it may be necessary to compare the proscribed religious conduct with similarly-situated nonreligious conduct in order to support a conclusion that the government is improperly targeting certain conduct only when it is engaged in for religious reasons. For example, in *Tenafly*, we examined a facially neutral ordinance barring citizens from affixing signs or items to utility poles. *Tenafly*,

309 F.3d at 151. The local government enforced the ordinance against an Orthodox Jewish group that attached lechis, religiously significant items, to the poles, but permitted others in the community to attach items such as ribbons and church directional signs. *Id.* at 167-68. The government's justification for the ordinance was to prevent clutter; however, the government failed to enforce the ordinance against other conduct that implicated its concern in the same way as the religious group's conduct. *Id.* at 167-68, 172. By comparing the prohibited religious conduct with permitted conduct that implicated the government's interest in the same way, we were able to conclude that the government enforced the ordinances only against conduct engaged in for religious reasons. *Id.* at 167-68.

As these examples show, examining how a law would apply, or is applied, to similarly-situated secular conduct may indeed be useful when dealing with Free Exercise challenges to facially-neutral laws because it helps courts to determine whether the law improperly targets religiously-motivated conduct. But such an analysis is not necessary when the text of the challenged law itself distinguishes between religiously-motivated conduct and nonreligiously-motivated conduct. *See Lukumi*, 508 U.S. at 532 ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue ... regulates or prohibits conduct because it is undertaken for religious reasons."). Thus, even if I were to accept the Majority's premise that a RLUIPA claim should be analyzed like a Free Exercise claim, I do not believe it follows that a religious assembly must identify "a better-treated secular comparator that is similarly situated in regard to the objectives

of the challenged regulation" under circumstances in which the face of the regulation distinguishes between religious and nonreligious assemblies. Instead, I believe a violation of section 2(b)(1) is established if the text of a zoning ordinance categorically excludes religious assemblies from an area where secular assemblies are permitted.

That is also the view of both the United States Courts of Appeals for the Seventh and the Eleventh Circuits, which have held that courts should not graft a "similarly situated" requirement onto section 2(b)(1) under circumstances in which the face of the land use regulation differentiates between religious assemblies and nonreligious assemblies. Each has stated that, for purposes of a challenge under section 2(b)(1), "the standard for determining whether it is proper to compare a religious group to a nonreligious group is *not* whether one is 'similarly situated' to the other, as in our familiar equal protection jurisprudence." *Vision Church*, 468 F.3d at 1002-03 (emphasis added) (quoting *Konikov*, 410 F.3d at 1324).

There are three other reasons that convince me Congress did not intend for courts to employ a "similarly situated" analysis when analyzing a section 2(b)(1) claim such as the one at issue here. The first is, again, the plain language of the statute. It does not state that religious and nonreligious entities must be "similarly situated" for a religious entity to find relief. *See Midrash*, 366 F.3d at 1229 ("[W]hile § [2](b)(1) has the 'feel' of an equal protection law, it lacks the

92

'similarly situated' requirement usually found in equal protection analysis.").[39]

Second, and closely related, the plain purpose of the statute, evidenced by its text and legislative history, shows that Congress was seeking to enforce the Free Exercise Clause. *See* 146 Cong. Rec. at S7776 ("Sections 2(b)(1) and (2) ... enforce the Free Exercise Clause rule against laws that burden religion ... ."). No one has cited, and I am not aware of, any Supreme Court case holding that parties must demonstrate that they are "similarly situated" to someone else to establish a violation of the Free Exercise Clause.

---

[39]According to the Eleventh Circuit, if the government implements a land use regulation that, on its face, treats a religious entity on less than equal terms with a nonreligious entity, and those entities fall within the "natural perimeter" of the definition of "assembly" or "institution," there is a violation of section 2(b)(1). *Midrash*, 366 F.3d at 1230-31. The "natural perimeter" test appears to me to be nothing more than a practical approach to interpreting words. It asks what the common-sense reach of language is. It is a recognition that words in statutes generally have enough of a commonly understood meaning that, when not unduly stretched, they can be construed and sensibly applied to resolve legal disputes. In short, it is a label that encourages what ought to happen in every case, not just in First Amendment jurisprudence, namely, application of the statutory text in a manner that gives the words their natural, generally accepted meaning.

Third, incorporating into RLUIPA the type of "similarly situated" analysis embedded in equal protection cases would frustrate Congress's intention of enforcing the Free Exercise Clause, because it would make it very difficult for religious assemblies to qualify for relief under section 2(b)(1). Our court has held that, to demonstrate that a religious entity is similarly situated to other entities permitted under a questioned zoning ordinance, one must show that the religious entity's purposes are not "functionally different" from the purposes of permitted entities, and that its uses "seem compatible" with the uses allowed in the area. *Congregation Kol Ami*, 309 F.3d at 142. Consequently, because religious and nonreligious assemblies and institutions are generally established for different purposes, with different goals and objectives, creative municipal officials and their lawyers should not find it difficult when a zoning conflict arises to find functional differences between the religious and nonreligious entities. *Cf. id.* at 130 (employing "similarly situated" requirement and "rational basis" test in vacating district court's decision that a municipality could not "allow a train station, bus shelter, municipal administration building, police barrack, library, snack bar, pro shop, club house, country club or other similar use to request a special exception under the [challenged] Ordinance, but not [a religious congregation]"). If a "similarly situated" requirement is read into the statute, local governments will

have a ready tool for rendering RLUIPA section 2(b)(1) practically meaningless.[40]

That is, sadly, exactly what has happened in this case. The District Court held that, because Lighthouse's "combination of intended uses ha[d] no similarly situated counterpart," Lighthouse was not "similarly situated to any nonsecular permitted uses either currently in existence or as imagined by the Redevelopment Plan" and thus could not establish a violation under section 2(b)(1). *Lighthouse*, 406 F. Supp. 2d at 518. With a somewhat different analysis, the Majority has come to the same conclusion. In light of the statutory text and the abundantly clear legislative history of RLUIPA, I find it difficult to believe that Congress intended to incorporate *sub silencio* an analytical requirement that, as has happened here, can so readily undo the explicit "less than equal terms" requirement of the statute.

### III. Conclusion

At a minimum, section 2(b)(1) means that a city's zoning ordinance cannot categorically exclude churches from

---

[40] Indeed, in *Digrugilliers,* the Seventh Circuit dealt with the city of Indianapolis's attempt to do just that. *Digrugilliers*, 2007 WL 3151201, at *1-2. In that case, the city defined "religious use" in its zoning code to include residential accessory uses (such as a rectory for the church minister) and then attempted, unsuccessfully, to use its own broad definition of "religious use" to justify its exclusion of churches from zones where other assemblies were permitted. *Id.* at 2.

an area where secular assemblies are permitted. In a case like this, there is simply no legitimate basis for grafting onto section 2(b)(1) a "substantial burden" requirement, a "similarly situated" requirement, or a "neutral and generally applicable" requirement. Congress used its powers under section 5 of the Fourteenth Amendment to enact a straightforward statute that courts can apply, if they will, and that state and local governments can follow, if they will. By grafting additional elements onto section 2(b)(1) that do not reflect congressional intention, we hinder Congress's objective of enforcing the Free Exercise Clause to the fullest extent constitutionally permissible. Therefore, while I concur in the judgment to the extent it reverses the District Court's decision regarding the C-1 Ordinance, I respectfully dissent from that portion of the judgment upholding summary judgment for the City.